# CHARLESTON.

## STATE v. ABBOTT.

### March 4, 1875.

1. The ninth section of chapter thirteen, of the Code of 1868, provides that "the repeal of a law, or its expiration, by virtue of any provision contained therein, shall not affect any offense committed, or penalty or punishment incurred before the repeal took effect or the law expired, save only that the proceedings had shall conform, as far as practicable, to the laws in force at the time such proceedings take place unless otherwise specially provided; and that if any penalty or punishment be mitigated by the new law, such new law may, with the consent of the party affected thereby, be applied to any judgment pronounced after it has taken effect.' The said Code of 1868 took effect on the 1st day of April 1869 On the 3d day of November 1873, A. was indicted in the county of Kanawha by the grand jury, then attending the circuit court of said county, for the murder of G. on the 11th day of September 1861, in said county, and the evidence shows that the killing was done at that time. At the time the killing was done the punishment prescribed by law was death.

The nineteenth section of chapter one hundred and fifty-nine of the code of 1868, provides that "if a person indicted for murder be found guilty by the jury, thereof, they shall, in their verdict, find whether he is guilty of murder in the first or second degree. If they find him guilty of murder in the first degree, they may, in their discretion, further find that he be punished by confinement in the penitentiary. If such further finding be not added to their verdict, the accused shall be punished with death; but if added, he shall be punished by confinement in the penitentiary during his life," &c.

On the 10th day of November 1873, A. plead not guilty to the indictment, and on that day there was a jury selected, empanelled and sworn according to law, to try the cause in said circuit court. The jury found A. guilty of murder in the first degree, and found that he be punished by confinement in the penitentiary; and the court, upon the verdict of the jury, rendered judg-

1875.
January Term

| 8 | 741 |
|---|---|
| 39 | 466 |
| 8 | 741 |
| 40 | 607 |
| 8 | 741 |
| 45 | 75 |
| 45 | 79 |
| 8 | 741 |
| 49 | 713 |
| 8 | 741 |
| 58 | 84 |

ment that A. be confined in the penitentiary of the State for and during his life.—HELD; that it was error in the court, in the trial of A., to apply the provisions of the Code of 1868, authorizing the mitigation of the punishment of murder in the first degree to confinement in the penitentiary during life without the consent of A. given in court and entered of record; and that without such consent of A., given in court and entered of record, before the verdict of the jury was received and recorded by the court, the punishment prescribed by the said ninth section of chapter thirteen of the Code of 1868, could not be applied by the jury or court. And in the absence of such consent, given by A. in court and entered of record, as a part of the proceedings in the cause, the punishment prescribed by the law, in force at the time the killing took place, should have been applied to the case.

2. Such consent of A. may be given and entered of record in court as part of the proceedings in the cause before the jury is empanelled and before the verdict of the jury is received and recorded. It would be the better and the safest practice for the court to ask A. to elect before, or at the time the jury is empanelled, under which of the said laws he desires and elects to be tried, and have applied to his case. Still, if A. did not then elect and consent to be tried under the new law, he should be allowed, by the court, to so consent at any time before the verdict of the jury is received and recorded by the court.

3. The record of the proceedings of an examining court are not necessarily a part of the proceedings of the trial of an indictment for felony in the circuit court. And if the defendant in such a case does not claim the benefit of an examining court, before trial in the circuit court, or raise the question before the circuit court, he cannot do so in the appellate court for the first time.

4. It was error in the circuit court to refuse to permit A., the defendant, at the trial, to prove his declarations made at the time of the shooting, which caused the death of the party killed. Such declarations, made at that time, are a part of the res gestæ and should be allowed to go to the jury to have such weight and credit as, under the circumstances, they may be entitled to, in connection with the other evidence, circumstances and facts.

5. The State having proved, as evidence against the defendant, before the jury, some words spoken by the defendant to the witness, who was present at the shooting, a few moments before the shooting, upon well established principles the defendant was entitled to prove all he said to the witness in that conversation at that time.

6. The jury, in the trial of an indictment for murder, are the judges of the evidence, and as to what degree of murder, if any, it proves, and not the court. Still the court may, under certain

circumstances, grant the defendant a new trial, at his instance, upon the ground that the verdict is contrary to the law and evidence, &c.

7. When it is proven *prima facie* that a murder has been committed, and it is claimed upon the evidence that the crime committed is murder in the first degree, because it is "murder by lying in wait," it is for the jury to determine from all the circumstances and evidence whether the murder is "murder by lying in wait," or whether the murder is murder in the first degree for any cause embraced by the statute ; or murder in the second degree, or voluntary or involuntary manslaughter, or whether the defen_ dant is guilty of any offense embraced by the indictment, though the court may instruct the jury as to matters of law relevant to the case.

8. The general rule, subject, perhaps, to some exceptions, is that, in the trial of indictments for homicide, evidence of previous threats made by the deceased against the prisoner and communicated to him, before the killing, is admissible, without reference to the question whether there is evidence tending to show that at the time of the killing the deceased was doing some overt act manifesting a present intention to carry such threats into execution ; or without reference to the question whether there was proof that the defendant may have acted upon a reasonable belief that he was in danger of death or great bodily harm at the hands of the deceased. Ordinarily the judge cannot assume whether there is evidence tending to prove such a state of facts as would make testimony of such communicated threats relevant; because this would be to decide on the effect of the evidence upon a material question in the case, a matter which belongs to the jury, What constitutes such overt act as will warrant a person in slaying his enemy in his own defense, is a question for the jury, to be resolved according to the circumstances of each particular case. No general rule can be laid down upon the subject.

9. Previous threats or acts of hostility, however relevant they may be, will not justify a person in seeking and slaying his adversary.

10. To excuse the slayer, he must act under an honest belief that it is necessary, at the time, to take the life of his adversary in order to save his own; and it must appear that there was reasonable cause to excite this apprehension.

11. When such threats and acts of violence, as above named, have, recently before the killing, been made by the person killed, against the accused, and communicated to him, before the killing, it is proper to permit the defendant to prove that on other occasions, recently before the killing, the said deceased threatened to others upon more than one occasion to kill the defendant on sight, for the purpose, at least, of showing the state of feeling of the deceased

towards the defendant, although it does not appear that such threats last named were communicated to the defendant, before the killing.

12. It was not error in the court to refuse to instruct the jury in this case, as the case is presented, that if, upon a consideration of all the evidence, they have a reasonable doubt as to whether the plea of self defense is made out, it is their duty to acquit the defendant.

13. It is error in a court, in a case of felony, to give to the jury instructions which are not relevant to the evidence, and which may mislead the jury to the prejudice of the defendant.

14. In criminal cases, if there be reasonable doubt of the guilt of the defendant, the jury are to give him the benefit of such doubt.

Writ of error granted on the petition of the defendant below to a judgment on the verdict of the circuit court of Kanawha county, rendered on the 13th day of December, 1873. The case is fully stated in the opinion of the Court.

The Hon. Joseph Smith, judge of said circuit court, presided at the trial below.

*Smith & Knight* and *Mollohan & Nash* for the appellant.

*Attorney General Mathews* for the State.

HAYMOND, PRESIDENT:

In considering this case I will, for the sake of convenience, designate the plaintiff in error as the defendant, he being the defendant in the court below.

The defendant, (St. Clair Abbott) was on the 3d day of November, 1873, indicted by the grand jury of the county of Kanawha, then attending the circuit court of said county, for the murder of Augustus Grass. The language of the indictment was as follows, to-wit: "That St. Clair Abbott on the 11th day of September, 1861, in the said county of Kanawha, in and upon the body of one, Augustus Grass, feloniously, wilfully and of his malice aforethought, did make an assault; and that the said St.

Clair Abbott a certain rifle gun there and then charged with gun-powder, and one leaden bullet, which rifle gun he, the said St. Clair Abbott, in his right hand then and there had and held, then and there feloniously, wilfully and of his malice aforethought, did discharge and shoot off to, against, and upon him, the said Augustus Grass, and that the said St. Clair Abbott, with the leaden bullet aforesaid, out of the rifle gun by the said St. Clair Abbott discharged and shot off as aforesaid, then and there feloniously, wilfully and of his malice aforethought, did strike and penetrate and wound the said Augustus Grass, in and upon the left side of the back of him the said Augustus Grass, giving to him the said Augustus Grass, then and there with the leaden bullet aforesaid, so as aforesaid discharged and shot out of the rifle gun aforesaid, by the said St. Clair Abbott in and upon the left side of the back, of him, the said Augustus Grass, one mortal wound, of which said mortal wound the said Augustus Grass from the said 11th day of September 1861, to the 12th day of September, 1861, in the county aforesaid, did languish and languishing did live, on which said 12th day of September, the said Augustus Grass, in the county aforesaid, of the said mortal wound died; and that the said St. Clair Abbott, him, the said Augustus Grass, in the manner and by the means aforesaid feloniously, wilfully and of his malice aforethought, did kill and murder." &c. On the 10th day of November the defendant filed a demurrer to the indictment, and, no reason being assigned therefor, the same was overruled by the court, and thereupon the defendant plead not guilty to the indictment. On the same day came a jury who being elected by lot, empanelled, tried and sworn the truth of and upon the premises to speak, on another day, subsequent, found the defendant guilty of murder in the first degree, and that the defendant, St. Clair Abbott, be punished by confinement in the penitentiary.

94

Afterwards, on the 13th day of December, 1873, the defendant moved the court to arrest judgment in the cause and to set aside the verdict of the jury and award him a new trial, which motion the court overruled, and the said defendant having no further reason to offer or assign why the court should not then proceed to pronounce judgment upon him in pursuance to the verdict of the jury, the court rendered judgment upon the verdict of the jury that the said St. Clair Abbott be taken from the county jail of the county, by the sheriff of the county, as soon as practicable after the rising of the court, thence to be removed to the public penitentiary of the State, there to be kept in close confinement in the manner prescribed by law, for and during the period of his natural life. And on motion of defendant the court suspended execution of the judgment for forty days. During the trial of the cause the defendant took *six* several bills of exceptions to opinions and rulings of the court which were signed, sealed and made a part of the record. The cause has been brought to this Court by writ of error upon the petition of the defendant, (Abbott), and it is now to be determined here whether there is error in the judgment of said circuit court sufficient to authorize and require this Court to reverse the said judgment of the circuit court, and if so what disposition this Court should make of the cause.

The *second* assignment of error made by the counsel for the defendant, (Abbott,) is, that the court erred in overruling the defendant's demurrer to the indictment. No reason has been assigned here by defendant's counsel why the indictment is not good and sufficient, and, after examination of the indictment, it seems to me that the indictment is a good indictment for murder. In Pennsylvania and Virginia the statute does not define the crime of murder, but refers to its known offense; nor so far as concerns murder in the first degree, does it alter the punishment, which was always death. All that it does is to

define the different kinds of murder, which shall be ranked in different classes and be subject to different punishments. It has not been the practice, since the passing of this statute, to alter the form of indictments for murder, in any respect; and it plainly appears by the act itself, that it was not supposed any alteration would be made. Tilghman, chief-justice, in *White v. Commonwealth*, 6 Binn., 182, 183. It is unnecessary in any case to charge specially such facts as would show the offense to be murder in the first degree. *Commonwealth v. Miller*, 1 Va. cas. 310; *Wicks v. Commonwealth*, 2 *Id.*, 387; 3 vol. Robinson's (old) Practice, 43. See also opinion of the court in case *Livingstone v. The Commonwealth*, 14 Gratt., 592; also *Hill's Case*, 2 Gratt., 594.

The first section of chapter one hundred and forty-four of the Code of this State of 1868, which took effect on the 1st day of April, 1869, and was in force at the time the defendant was tried and convicted of murder in the first degree, provides that "murder by poison, lying in wait, imprisonment, starving, or any wilful, deliberate and premeditated killing or in the commission of or attempt to commit arson, rape, robbery or burglary, is murder in the first degree." All other murder is murder of the second degree.

The second section provides that murder in the first degree shall be punished by death, except as provided in chapter one hundred and fifty-nine of this act.

The third section provides that "murder in the second degree shall be punished by confinement in the penitentiary not less than five nor more than eighteen years."

Section four provides that voluntary manslaughter shall be punished by confinement in the penitentiary, and,

Section five that "involuntary manslaughter shall be a misdemeanor."

The nineteenth section of said chapter one hundred and fifty-nine of the Code, provides that "if a person indicted for murder be found guilty by the jury thereof, they

shall, in their verdict, find whether he is guilty of murder in the first or second degree. If they find him guilty of murder in the first degree, they may, in their discretion, further find that he be punished by confinement in the penitentiary. If such further finding be not added to their verdict, the accused shall be punished with death; but if added, he shall be punished by confinement in the penitentiary during his life," &c.

The law upon murder at the time the murder in the indictment in this case is alleged to have been committed, and also at the time Augustus Grass, in the indictment mentioned, was, in fact, killed or murdered, as appears from the record, was the same as in the Code of 1868, which I have quoted, except that the law then in force provided that murder in the first degree shall be punished with death.

The ninth section of the Code of Virginia of 1860, which was in force in this State when the offense in this cause is alleged to have been committed, provides that sentence of death shall be inflicted by hanging.

It is evident from the verdict of the jury, the judgment of the court, as well as from some instructions or rulings of the court during the trial, that the court was under the impression that the law in force at the trial, touching the punishment of murder in the first degree, was applicable to the trial of the defendant, and that law was applied by the court in the trial of this cause, and in its judgment, so far as the record discloses, without the consent of the defendant.

The ninth section of chapter thirteen of the code of 1868, provides that the repeal of a law, or its expiration, by virtue of any provision contained therein, shall not affect any offense committed, or penalty, or punishment incurred before the repeal took effect or the law expired, save only that the proceedings thereafter had shall conform as far as practicable, to the laws in force at the time such proceedings take place, unless otherwise specially provided; and that if any penalty or

punishment be mitigated by the new law, such new law may, with the consent of the party affected thereby, be applied to any judgment pronounced after it has taken effect. The punishment of murder in the first degree was mitigated by the nineteenth section of chapter one hundred and fifty-nine of the code of 1868, or perhaps it would be proper to say that section authorized the jury to mitigate the punishment from death to confinement in the penitentiary for life. The new law mitigating the punishment might have been applied in this case by the court and jury with the consent of the defendant being thereto first given at the proper time, and entered of record. The law in force at the time the offense was committed, prescribing the punishment, should not have been applied in this case unless the defendant elected and consented that the punishment prescribed by the nineteenth section of said chapter one hundred and fifty-nine, should be applied, *Gregg v. The State*, 3 W. Va., 705. In the case just cited Judge Maxwell says: "The penalty or punishment is mitigated under the new law, and the accused was entitled to have judgment against him under the new law if he so elect; but such election ought to be made by him before the verdict of the jury is received and recorded, when if he elected to be punished under the new law it would be the duty of the jury to say whether he should be punished with death or by confinement in the penitentiary for his life. The election cannot be made after the jury renders its verdict, because the court has no power to mitigate the punishment. The accused not having consented before the jury rendered its verdict, to be punished according to the new law, the jury rendered their verdict according to the law in force when the offense was committed, which I think sufficient to justify the judgment of the court." The principles decided in the *Gregg Case* we follow in this case as we now understand them. Gregg was tried, convicted and sentenced under the law in force at the time the offense was committed, but the defendant was

tried and convicted under the new law without his con-
sent so far as appears. It was error in the court and
jury to apply the new law mitigating the punishment to
the defendant's case without his consent spread on record,.
and that consent should be given by the defendant, cer-
tainly before the verdict of the jury is received and
recorded by, the court, and might very properly be given .
before the jury is sworn and empanelled. I think the
more safe practice would be to allow the defendant to
elect and consent before the jury is empanelled, but
still I would not deprive him of the privilege of doing
so at any time before the verdict of the jury is received
and recorded by the court; and it would be error to do
so. It would perhaps be the better practice for the court
to ask the defendant to elect in such case, before trial,.
under which law he desires to be tried.

The *first* assignment in error made by the defendant's
counsel before this Court is that the indictment was
found against the defendant at the November term; and
at the time of the trial, conviction and judgment afore-
said, there was no record in said circuit court showing
that defendant had ever been examined by the county
court of said county, or that he had waived said exam-
ination in said county court, and it does not appear from
the record that defendant waived such examination in
the circuit court. It does not appear by the record in
this case that the defendant made any question before
the circuit court touching an examining court by motion,.
or in any proper form claimed that he had not been ex-
amined for the offense charged in the indictment by the
county court of the county of Kanawha. The record of
the examination of a prisoner for felony is not necessa-
rily a part of the record of the trial and proceedings of
the prisoner for the same offense in the circuit court
upon an indictment. This assignment of error is fully
covered by the opinion and decision of this Court in the
case of the *State v. Stewart*, 7 W. Va., 731, and for the
reasons stated in that opinion, this assignment of error
is not well taken here, and must be overruled.

The *third* assignment of error is that "The court erred in refusing to permit defendant to prove by the witness Jarrett what was said by defendant at the time of the alleged shooting; the court also erred in refusing to let the defendant prove by said Jarrett what reasons defendant gave for shooting said Grass at the time he shot. What the defendant said at the time of the shooting was a part of the *res gestæ*; it was also a part of a conversation, a portion of which had been proven by the said witness on behalf the State. It was also admissible to show the intent with which the act was done."

By bill of exceptions No. 1, it appears that after the attorney for the State had made to the jury the opening statement of the case on behalf of the State, the attorney representing the defendant announced to the jury, in his opening statement, on behalf of the defendant, that if the State should succeed in proving to the jury that defendant killed deceased, Augustus Grass, as .alleged in the indictment, he expected to show that the killing was in self defense. And it was thereupon proved by the State that, on the 11th day of September, 1861, about nine o'clock in the morning, the deceased, Augustus Grass, left his home on Paint Creek, in Kanawha county, and went down said Creek to look for his boys, who had gone down the Creek that morning to get a load of wood; that he met his boys a mile or a mile and a half below his house returning with a load of wood, and that he got on the wagon, and sitting between two of the boys, drove towards home; while so sitting on his wagon, he was shot in the left side of his back, just above the hip, the ball passing through his body and lodging under the skin on the front side; that one of his boys helped him on one of the horses, taken from the wagon, upon which he rode home, where he died that night about midnight from the wound so received. It was also proved by the State that the shot came from the left hand side of the road, going up the Creek, and when he was shot he jumped

from the wagon and said he was killed; that three of his boys were with him at the time, aged, respectively, ten, twelve and fourteen years, that they heard the gun fired but saw no one; that the place where the shooting occurred was in Kanawha county. It was also proved by the State that the defendant, sometime after the shooting, said to a witness that he hollowed when the gun went off, but witness did not know to whom or what defendant referred. It was also proved that soon after the shooting, the defendant told another witness that he had killed Grass, and some time after told the same witness that he, defendant, did not kill Grass. This witness could not tell how this conversation with defendant came about, nor what else was said between them. The State also proved by a witness named Mary Jarrett, that sometime before the shooting, defendant, Harrison Johnson and Garrison Massey came to her house on Paint Creek and inquired for deceased, Grass; that she replied he had gone down the Creek to the River; that thereupon one of them, in the presence of the others, and witness believed it was Harrison Johnson, said he (Grass) had gone to carry news to the rebels and would not get back again; that this was three or four days before Grass was shot, and that the late civil war was then raging, and it was then *"scary"* times on Paint Creek. The State also proved by a witness, Alethia Johnson, that a short time after Grass was shot, defendant told her and her sister, since deceased, that he killed Grass, and that if they told it they would go the same way. Witness was then twelve years old and her sister a year or two older. Witness could not tell how the conversation with defendant came about, or any thing else that was said, or that anything else was said, only that defendant came along the road by the door where they were standing and made the above remark; that no one else was present. The State then introduced another witness named Anderson Jarrett, who proved that, on the morning Grass was shot, he and the defen-

dant were out in the highland field, on the left hand side of the road going up Paint Creek, with their guns, looking for Southern soldiers, who they had heard were coming in ; that while there they saw Grass and his three boys riding towards Grass' house.  Defendant told witness to shoot Grass, which witness declined to do ; that defendant then stepped behind a hickory tree and shot Grass, who had then got a short distance by them ; that Grass, being shot, jumped from the wagon, and said that he was killed, and then got on one of the horses and rode off ; that defendant and witness were about seventy-five yards from Grass when the shot was fired.  When the State concluded the examination of this witness the defendant, by his counsel, on cross examination, asked the witness what defendant said when he shot Grass, to which question the attorney for the State objected, which objection was sustained by the court, and the witness not permitted to answer the question.  The defendant, by his counsel, then asked witness what reason defendant gave for shooting Grass, at the time he shot.  To which question the attorney for the State also objected, which objection was also sustained by the court, and the witness not permitted to answer the said last mentioned question.  To which ruling and action of the court in sustaining the objections to said questions and to each of them, and in refusing to permit the witness to answer said questions, or either of them, the defendant excepted, and prayed his exceptions be signed, sealed, saved to him and made a part of the record, which was done.

The question now to be determined is, did the court err under the circumstances in refusing to allow the said questions, or either of them, propounded by the counsel of defendant to witness Anderson Jarrett, to be answered by the witness?  In other words, was it competent for the defendant to give in evidence to the jury his declarations made at the time of the shooting ?  "The surround-

ing circumstances constituting parts of the *res gestæ*, may always be shown to the jury along with the principal fact; and their admissibility is determined by the judge, according to the degree of their relation to that fact, and in the exercise of his sound discretion; it being extremely difficult, if not impossible, to bring this class of cases within the limits of more particular description. The principal points of attention are, whether the circumstances and declarations offered in proof were contemporaneous with the main fact under consideration, and whether they were so connected with it as to illustrate its character. Thus, where a person enters into land in order to take advantage of a forfeiture, to foreclose a mortgage, to defeat a decision, or the like, or changes his actual residence or domicil, or is upon a journey, or leaves his home, or returns thither, or remains abroad, or secretes himself; or, in fine, does any other act, material to be understood; his declarations, made at the time of the transaction, and expression of its character, motive or object, are regarded as 'verbal acts, indicating a present purpose and intention,' and are, therefore, admitted in proof like any other material facts." 1 Green. on Ev. Sec. 108. In the case of *Munroe v. The State of Georgia*, 5 Georgia, 85, it was decided that "when an act is done to which it is necessary to ascribe a motive, it is always considered that what is said at the time, from which the motive may be collected, is a part of the *res gestæ*. In general, what a party says is not evidence in his favor, unless it be a part of a conversation, of which some other part has already been given in testimony. But when the declarations of the party accompany the act, and are a part of the transaction, they are admissible." In the case of *Garber v. The State*, 4 Cold. (Tenn.) 161, it was decided that "proof of the declarations of the parties made a very short time before the killing, while they were going in the direction of the place where it occurred, explaining why they were going in that direction, and for what purpose they were seeking the de-

ceased, constitutes a part of the *res gestæ*, and should be allowed to go to the jury." This case was decided in 1867. The case of *Cornwell v. The State*, (Mart. and Yer. 147,) is cited in this last case in which the court said: "It is a great mistake to suppose that the *res gestæ*, in the legal sense, is, in a case of murder, confined to the fact of thrusting the knife into the body, and thereby depriving of life. The *res gestæ* is the murder, and the murder is made up of the homicide and the intent with which it was committed. Actions, therefore, which seem to demonstrate the *quo animo* are a part of the *res gestæ*, and words which are a part of these actions are admissible." In the case of *Comfort v. The people of the State of Illinois*, 54 Illinois, 404, it was decided that upon the trial of a party under an indictment for the larceny of a watch, it was proven that the prisoner, being in possession of the watch a short time after it was stolen, met a pawn broker away from the place of business of the latter, and proposed to pledge the watch as security for a loan of money. The parties went together to the pawn broker's shop, when the prisoner received the money and placed the watch in pledge. *Held*, it was competent for the prisoner to prove all that was said by him, when he first approached the pawn broker, in connection with the subject, and as to the manner he obtained the watch, not only as a part of the *res gestæ*, but as a part of the conversation, to be given such weight by the jury as, from all the other evidence in the case, it might seem entitled." It seems to me, after much thought upon the subject, that the circuit court erred in refusing to allow the witness Anderson Jarrett, to answer the two questions propounded to him on cross-examination by defendant's counsel. The State having proved some words spoken by the defendant to Jarrett a few moments before the shooting, the defendant, upon well established principles, was entitled to prove all he said to Jarrett at that time. But the defendant was also entitled to prove as part of the *res gestæ* all he said at the time of the

shooting. . The words spoken at that time constitute part of the transaction, being contemporaneous therewith. Such declarations of the accused, when given in evidence, are to have such weight and credit with the jury as they may be entitled to under all the circumstances. The jury are to consider them in connection with all the other evidence in the cause. The jury must judge from all the facts and circumstances shown in evidence, whether the mature purposes or intention of the accused as declared by him at the time were feigned or were a mere pretence or pretext assumed to cover up his real purpose, object or intention in the shooting, or whether they were *bona fide,* and if *bona fide* whether they amounted to a legal justification or excuse for the act or should justly affect the degree of guilt of the defendant, when considered in connection with all the other facts and circumstances in evidence in the cause. "The declarations of the defendant," Mr. Greenleaf says in the one hundred and tenth section of his work on Evidence "must be concomitant with the principal act, and so connected with it, as to be regarded as the mere result and consequence of the co-existing motions, in order to form a proper criterion for directing the judgment, which is to be proved from the whole conduct."

The *fourth* assignment of error of defendant is . as to the rulings and declarations of the court in the presence of the jury as set forth in defendant's bill of exceptions No. 2. By this bill of exceptions it appears that after the State had closed her evidence in chief, the defendant, introduced a witness and offered to prove that a few days before the deceased, Grass, was shot, said Grass made an attempt to shoot defendant, and being prevented by the witness said to witness: "You might as well let me kill him now, for I am bound to kill him any how," and also that this attempt and threat were made known to the defendant by witness within a few hours thereafter; that thereupon the attorney for the

State objected to the introduction of this evidence upon the ground that the State had proved the killing to be by lying in wait, which was, by the statute, murder in the first degree, and that no previous threats or attempts on the part of the deceased to take the life of the defendant could justify the offense or reduce the grade, which objection was overruled by the court, and the evidence permitted to go to the jury, and the court in permitting the evidence to go to the jury stated in the presence and hearing of the jury that if there was no other ground upon which the court would permit such threats and attempts to go to the jury, it would permit them upon the ground that the statute prescribed two penalties for murder in the first degree, one capital and the other imprisonment for life, and that such threats and attempts might be proper for the consideration of the jury in determining which of said punishments to inflict; that thereupon the counsel for the prisoner asked the court if it permitted said threats and attempts to go to the jury only for the purpose above stated, and the court in response to said question stated in the presence and hearing of the jury that it admitted said threats and attempts only for that purpose, viz: because the statute prescribed the two penalties for murder in the first degree. To which action and statement of the court so made in the presence of the jury, the defendant also excepted, &c. As has been already said the indictment in this case is for murder but it does not charge that the murder was by "lying in wait." In *Hill's Case*, 2 Gratt. 594 it was *held* "that every homicide is *prima facie* murder in the second degree and in order to raise it to murder in the first degree the Commonwealth must assume the burden of proving the elements of that crime." In the case under consideration the State proved the homicide and therefore according to the case just cited in 2 Gratt., made a *prima facie* case against the defendant of murder in the second degree, and the State gave evidence tending to prove that the alleged murder was committed by such means and

under such circumstances as would make the murder, murder in the first degree, in the absence of other sufficient facts and circumstances, and it was claimed by the attorney for the State, before the court and jury, that the evidence proved that the murder was by "lying in wait." But it must be remembered that, generally, in the trial of criminal cases, the jury are the judges of the evidence and as to what degree of murder, if any, it proves, and not the court; still, the court may, under certain circumstances, grant a new trial at the instance of defendant. As to whether the evidence proves murder in any degree against the defendant, the jury are the judges. And they are also the judges as to whether the murder, if committed, was by "lying in wait," or otherwise. The court may, properly, instruct the jury as to matters of law, arising upon the trial, but the court should not assume, in its instructions to or rulings before the jury, or express or intimate an opinion, in the presence of the jury, that the evidence proves the defendant on trial guilty of murder in any degree, or any other less offense embraced in the indictment. When the court does so, it entrenches upon and derogates from the province of the jury. It would be difficult to estimate the influence an assumption by the court as to what has been made out by the evidence against a defendant, or even the expression of an impression or intimation of an opinion by the court in that regard, might have upon the minds of the jury.

When it is proven *prima facie* that a murder has been committed, and it is claimed from the evidence that the crime committed is murder in the first degree, because it is murder by "lying in wait," it is for the jury to determine, from all the circumstances and evidence, whether the murder is murder "by lying in wait," or whether the murder is murder in the first degree, for any cause embraced by the statute, or murder in the second degree, or voluntary or involuntary manslaughter, or whether the defendant is guilty of any offense covered by the in-

dictment, though the court may instruct the jury in matters of law relevant to the case. In "Cases on Self-Defense," by Herrigan and Thompson, page 476, there is the case of *Jackson v. The State,* reported as having been decided by the Supreme Court of Tennessee, at the April term, 1873. Judge McFarland delivering the opinion of the court. The syllabus, as given, is as follows, to-wit: "The general rule, subject, perhaps, to exceptions in extreme cases, is, that in the trial of indictments for homicide, evidence of previous threats made by the deceased against the prisoner, and communicated to him, before the killing, is admissible without reference to the question whether there is any evidence tending to show that at the time of the killing, the deceased was doing some overt act, manifesting a present intention to carry such threats into execution; or without reference to the question whether there was proof that the defendant may have acted upon a reasonable belief that he was in danger of death or great bodily harm at the hands of the deceased. Ordinarily the judge cannot assume whether there is evidence tending to prove such a state of facts as would make testimony of such communicated threats relevant; because this would be to decide on the effect of the evidence upon a material question in the case—a matter which belongs exclusively to the jury. What constitutes such an overt act as will warrant a person in slaying his enemy in his own defense, is a question for a jury, to be resolved according to the circumstances of each particular case. No general rule can be laid down upon the subject. Previous threats or acts of hostility, however violent they may be, will not justify a person in seeking and slaying his adversary." The judge, in his opinion, holds that, "to excuse the slayer, he must act under an honest belief that it is necessary at the time to take the life of his adversary, in order to save his own; and it must appear that there was reasonable cause to excite this apprehension." See page four hundred and eighty-four. He further says, on page four hundred

and eighty-five, in speaking of threats: "In fact, we think the practice has been very general to admit proof of this character, and leave its effect to be determined with proper instructions." In the case of *The People v. Strong*, 30 Cal., 151, "it is *held* that it is for the jury, in a criminal case, to determine whether evidence introduced upon a given point amounts to proof of the fact sought to be proved." "In the case of *Whitely v. The State of Georgia*, 38 Georgia, it was *held* that when the charge of the court assumes certain things as facts, and is in such shape as to intimate to the jury what the judge believes the evidence to be, and that they made defendant guilty, a new trial will be granted." In the case of *Monroe v. The State of Georgia*, 5 Georgia, it was *held* that "threats, accompanied with occasional acts of personal violence are admissible to justify the reasonableness of the defendant's fears, provided a knowledge of the threats is brought home to him." In the same case, it was *held* that "The declarations of a defendant antecedent to the fact are sometimes admitted as tending to explain and reconcile his conduct, and to discover the *quo animo* with which the act was committed." Upon the which it seems to me that the circuit court erred in stating, in the presence of the jury, that it admitted the threats to go to the jury upon the ground only that the statute prescribed two penalties for murder in the first degree, one capital and the other imprisonment for life, and that such threats might be proper for the consideration of the jury in determining which of said punishments to inflict, *first*, because the statute to which the court refers did not properly apply to the defendant's case, it not appearing by the record that he consented that such statute, which is the new law, should be applied to his case, and *secondly*, because, it was improper for the court, on admitting the threats, &c., to restrict the purposes for which the jury might consider them to so narrow limits. The threats were properly admitted by the court, as evidence, but

the jury should have been allowed to consider them in connection with the other evidence in the cause, to have such weight and effect as they were entitled to. It also seems to me from the words employed by the court in stating the reason why it admitted the evidence of the threats, and the only purposes for which the evidence was admitted that the jury might well have inferred that in so stating the court assumed, or intimated an opinion that the evidence against the defendant made out a case of murder in the first degree—although the court doubtless did not intend to be understood as so assuming or intimating before or to the jury.

By defendant's bill of exceptions No. 3, it appears that after the State had closed its evidence in chief, and after the defendant had given evidence to the jury, as stated in bill of exceptions No. 2, the defendant also proved that a short time before Grass was shot, the said Grass, on two or three different mornings brought his gun out into his door yard and shot it off, saying each time that he had kept that charge long enough for the Black Buck, and then reloaded his gun; that one Thomas Good, who was present on these two or three occasions, said to Grass, on the last of these occasions, that he would like to be along when he shot the Black Buck; that Grass replied to Good that he did not want anybody with him when he shot the Black Buck; that Grass was then asked by Good what he meant by the Black Buck, and Grass replied that he meant St. Clair Abbott (the defendant), and that these conversations and these transactions were immediately thereafter communicated to the defendant by said Good. The defendant also proved that some time before the shooting, the exact time not recollected by the witness, that Grass sent word by one Garrison Massey to the defendant that he, Grass, would kill the defendant, within three days, and that he, said Grass, intended to go away, and that this message

96

was also communicated to the defendant, before the shooting; and thereupon two other witnesses were produced and sworn on behalf the defendant, to-wit: Thomas Massey and Mary Jarrett, by whom the defendant offered to prove that on two other separate and distinct occasions, and a short time before the shooting, he, Grass, threatened to kill the defendant on sight, which evidence being objected to by the attorney for the State, was rejected by the court and not permitted to be given to the jury, because the defendant was unable to prove that the last two threats were brought to the knowledge of the defendant before the shooting—the court ruling that no threats made by Grass against the defendant, could be admitted in evidence unless knowledge of such threats was brought home to the defendant before the shooting; to which ruling and action of the court in rejecting the proof of the two threats above named, and in deciding that no threats made by the defendant should be proved unless knowledge thereof was brought home to the defendant before the shooting, the defendant excepted. The question involved in this ruling of the court has been very much discussed by the authorities, and there seems to be some confusion upon the subject. In the case of *Pitman v. The State.* 22 Ark., 354, it was *held* that "on the trial of an indictment for murder, threats and declarations of hostile purpose and feeling made by the deceased on the day and near the time of the killing, and his acts and conduct indicative of an intention to execute such threats are admissible in evidence as part of the *res gestæ*, though the threats were not communicated to the defendant." In the case of *Keener v. The State,* 18 Georgia, 228, the court say: "The true distinction, we apprehend, as to the admissibility of evidence of threats, and one apparently overlooked in many of the cases, is this: When sought to be introduced by the defendant as a justification for the homicide, and without any overt act, he must show that they have been communicated; otherwise they can furnish no excuse for their conduct,

but when offered to prove a substantive fact, namely: the state of feeling entertained by deceased towards the accused, it is competent testimony, whether a knowledge of the threats be brought home to the defendant or not." In the case of *Stokes v. The People of the State of New York*, 53 N. Y., 164, it was decided; "where, upon trial of an indictment for murder, evidence had been given making it a question for the jury whether the act was perpetrated by the prisoner in defending himself against an attempt on the part of the deceased to murder or to inflict some great bodily harm upon him—*held* that evidence of violent threats made by the deceased against the prisoner a short time before the occurrence, was proper, although such threats were not communicated to the prisoner." It seems to me that under the circumstances, the court erred in rejecting the evidence of the witnesses Thomas Massey and Mary Jarrett as to the said declarations of the said Grass, made a short time before the shooting. The said evidence of such declarations of Grass (the deceased) should have been allowed to go to the jury at least to show the state of feeling of said Grass toward defendant, in connection with the other evidence upon that subject, although it does not appear that said threats were communicated to the defendant before the killing.

By the defendant's fourth bill of exceptions it appears that the defendant asked the court to give the following instruction to the jury, viz: "If the jury upon a consideration of all the evidence have a reasonable doubt as to whether the plea of self-defense is made out, it is their duty to acquit the defendant. To the giving of which instruction the attorney for the State objected; and the objection was sustained by the court and the court refused to give the instruction and in refusing said instruction stated in the presence and hearing of the jury that when a defendant in an indictment for murder set up a plea of self-defense he must prove his plea to the satisfaction of the jury; and the defendant

excepted to the opinion of the court in refusing to give said instruction and the said statement of the court made in the presence of the jury," &c. The question raised by this bill of exceptions is interesting and important— It is a question about which there has been much difference in opinion among the legal profession. In criminal cases, and especially felonies, the rule is that the person charged is presumed to be innocent, until he is proven guilty and if upon the consideration of all the evidence, there be a reasonable doubt of the guilt of the accused, the jury are to give him the benefit of that doubt. In criminal cases, the jury, in finding a verdict, do not weigh the evidence in the sense that they are required to do in civil cases. In the one class of cases, they are to weigh it carefully, and decide according to its preponderance, although it may not be free from reasonable doubt. In criminal cases however, neither a preponderance of evidence, nor any weight of preponderant evidence is sufficient for the purpose, unless it generate a full belief of the fact to the exclusion of all reasonable doubt. 3 Greenl. on Ev. 29; Wharton's Am. Crim. Law, 2d Ed. 264. "If the accused shall concede the fact of the killing, or if it be found that he is the author of the homicide, and he relies upon the matter in excuse or justification of the act, the inquiry arises, whether he must prove such matter beyond a reasonable doubt. Whatever the rule may be when he relies on some distinct, substantial ground of defense, not necessarily connected with the transaction upon which the indictment is founded, (such as insanity if that can be such, which I do not now determine), I know of no well considered case that has gone so far, as to hold that where the defense is confined to the circumstances accompanying the original transaction, (as that the accused acted in self-defense,) that he must prove such justification or excuse beyond a reasonable doubt. "In the case of *Tweedy v. The State of Iowa,* 5 Iowa, 436, judge Wright, who seems to have delivered the opinion of the

court, says, "Now applying this rule to the defense contemplated by this instruction, taking for the present the strongest view of it against the prisoner and how does it stand? He is presumed to be innocent. This presumption, says the prosecution, is rebutted and removed, when it is found, or conclusively established, that he was the author of the homicide. Grant this, and that he does then stand in the attitude of guilt, then it seems to us, that if the circumstances, whether proven by him, or the State, preponderate even, in favor of the matter of excuse or justification, there instantly arises a reasonable doubt of his guilt and an acquittal should follow. Whereas, if he is required to establish such defense beyond a reasonable doubt, then most manifestly, they should entertain a reasonable doubt of his guilt. And this process of reasoning, is quite as favorable, certainly, as the State could ask. But we need not stop here, for the prisoner, in such cases, is entitled to even a more favorable rule. The defense of the defendant, related to and grew out of the transaction or *res gestæ*, which constituted the supposed criminal act. To establish it, he was not required to, and need not, assume anything aside or out of the case, on the part of the government. He had a right to claim and insist, that, taking the facts and circumstances all together, as proved on both sides, he was not shown to be guilty; and if the facts constituting the transaction, on which the prosecution rested, did not prove, beyond a reasonable doubt, that he committed the offense with which he was charged, (or one necessarily included in it,) he was entitled to an acquittal. To constitute the crime of murder, the person must have killed the person named in the indictment with malice aforethought, either expressed or implied. If the killing was justifiable, then there was no malice aforethought; it was not murder—nor was it manslaughter." This, I think, in most respects, declares correct principles of law. But whether the self-defense, or other justification set up, and

1875.
January Term.
State
v.
Abbott.

which the evidence and circumstances tend to prove, is necessarily connected with the original transaction, or is some distinct, substantive defense; if the circumstances and evidence tend to prove self-defense, or other legal justification, then as to the question of whether the act was done in self-defense, or other legal justification, if in the opinion of the jury a substantial conflict of circumstances or other evidence exists, there should be such a preponderance of circumstances or other evidence against the self-defense or other justification, as to reasonably satisfy the mind of the jury, that the killing was not in self-defense or justifiable, before they can convict. If there be in the opinion of the jury, a substantial conflict of the evidence or circumstances as to whether the killing was done in self-defense, and the circumstances or other evidence preponderate in favor of self-defense, and I should add, if it was equally balanced as to the killing being done in self-defense, the jury ought not to convict either of murder or manslaughter. While the instruction asked of the court by defendant's counsel, mentioned in said bill of exceptions No. 4, very nearly propounds the law correctly on the subject; still, I do not think it is fully correct in this case, as the case is presented. The statement of the court, made in the presence of the jury, that when "the defendant, in an indictment for murder, sets up the plea of self-defense, he must prove his plea to the satisfaction of the jury," is not objectionable, as a general rule, as to this subject. Each case, to a great extent, must depend very much upon the circumstances attending it.

By the defendant's fifth bill of exceptions, it appears that after the evidence and arguments of counsel were concluded, as well on behalf of the State as on behalf of the defendant, the attorney for the State asked the court to give *two* instructions to the jury, as follows, viz: "1. If the jury believe, from the evidence, beyond a reasonable doubt, that St. Clair Abbott killed Augustus Grass, by

1875.
January Term.

State
v.
Abbott.

lying in wait, when the said Augustus Grass was on the road driving his team, and doing no harm or injury to said Abbott, then no previous threats or attempts at violence on the part of Grass can justify or excuse the act, or reduce it from murder in the first degree." "2. If the jury believe, from the evidence, beyond a reasonable doubt, that St. Clair Abbott killed Augustus Grass, as alleged in the indictment, lying in wait, then said killing is murder in the first degree." To each of which instructions the defendant by his counsel objected, which objection was overruled by the court, and both of the instructions were given to the jury. And the court also voluntarily gave the following instruction to the jury which is in the words following, viz: "It is not every killing that amounts to either murder or manslaughter. Killing may be either justifiable or excusable. In cases where the defense of justifiable homicide is claimed or set up, it is necessary for the defense to show: that there was immediate and pressing danger of life, limb or great bodily harm ; that he had reason to believe the act necessary to protect himself from this impending danger ; that previous threats and attempts are not sufficient to justify a killing; that the statute clearly fixes that killing by lying in wait is murder in the first degree ; that neither previous threats nor attempts will reduce to a lower grade or justify a killing by lying in wait, under the statute." To the giving of the last named instruction by the court the defendant also objected, but his objection was overruled, and the instruction given to the jury. To the opinion of the court in giving each and all of said instructions to the the jury the defendant excepted, &c. Whether each or all of the instructions, so given by the court, to the jury, expound the law correctly, upon the subject involves most important and interesting legal questions touching the criminal laws in force in this State. By the common law, murder is where a person of sound memory and discretion, unlawfully kills any reasonable creature

in being, and in the peace of the commonwealth, with malice prepense or aforethought, either express or implied. Wharton's Am. Crim. Law, 356, 357. As I have before stated it was *held* in *Hill's Case* 2 Gratt. 594, that every homicide is *prima facie* murder in the second degree, and in order to raise it to murder in the first degree the commonwealth must assume the burden of proving that crime. In the case under consideration the attorney for the State, assuming that the evidence before the jury tended to prove that the defendant had murdered Augustus Grass, and that the murder was by "lying in wait" asked the court to give to the jury the first and second instructions which the court gave. In considering these two instructions I will first ascertain whether the instructions if they were good law, were relevant to the case as made out by the evidence.

The evidence given to the jury is certified by the court and is a part of the record. That Grass (the deceased) was killed by the defendant by shooting at the time alleged in the indictment, the evidence as certified seems to establish, but whether the evidence tends to prove that the killing was murder by lying in wait is another question. The only evidence in the cause bearing upon the question as to whether the killing, was murder by lying in wait is the following: "The State also proved that on the morning Grass was shot, the defendand one Anderson Jarrett, were out in the 'Highland Field,' on the left hand side of the road going up Paint Creek, with their guns, looking for Southern soldiers who they had heard were coming in; while there they saw Grass and his three sons riding towards Grass' house; that defendant told said Anderson Jarrett to shoot Grass, which Jarrett declined to do; that the defendant then stepped behind a hickory tree and shot Grass, who had then gotten a short distance by the defendant and said Jarrett; that Grass being shot, jumped from the wagon and said he was killed, and got on one of the horses and rode off; that the defendant and Jar-

rett were about seventy-five yards from said Grass when the shot was fired, that it was two or three minutes from the time defendant and said Anderson Jarrett first saw Grass coming, to the time the shot was fired." Bouvier, in his Law Dict., says, lying in wait, is "being in ambush for the purpose of murdering another." In the case of *Burgess v. The Commonwealth*, 2 Va. Cases, 483, judge Dade in delivering the opinion of the court on page 488 says, "Now, we take the expression *'lying in wait,'* not, merely to mean his concealing himself in the path of his intended victim for the purpose of killing him, but the deliberately and premeditatedly seeking an occasion to effect the deadly purpose." In *Jones' Case*, 1 Leigh, 598, Judge Daniel says : "Lying in wait may be with a view to great injury, abuse and bodily harm, without the settled purpose to kill." In Tennessee the statute in relation to murder in the first and second degree, is substantially the same as in Virginia and this State. And in the case of *Riley v. State*, 9 Hump., 646, it appears on page 651, in the opinion of the court, that the judge, at the trial, before the jury, among other things, instructed the jury in substance : "That to constitute lying in wait, three things must concur, to-wit : waiting watching, and secrecy ; and that these facts must be established beyond a reasonable doubt, to authorize the conclusion that there was lying in wait ; that if they should be of opinion there was such lying in wait, and that the fatal blow was given by the prisoner, so lying in wait, for the purpose of inflicting some great bodily harm upon the deceased, (though short of the intention of taking life, but which would be murder at common law,) it would be murder in the first degree." The court further stated to the jury, "that if any stick or other weapon is used by one lying in wait for the purpose, calculated to produce great bodily harm, and if, used in such manner, great bodily harm is the probable consequence, and that death ensue, so that it would be

97

murder at common law, it is murder in the first degree."
The evidence which I have stated did not prove, or suf-
ficiently tend to prove, that the killing amounted to
murder by "lying in wait." It does not appear, nor
does the evidence tend to prove, that the defendant was
"lying in wait" for the deceased, Grass, for any purpose
whatever, on the occasion of the shooting. But the evi-
dence proves that he and Anderson Jarrett were together,
and that they were in the "Highland Field" for another
and different purpose altogether. Whether the evidence
proves, or tends to prove, the killing to amount to mur-
der in the first degree, for reasons other than mere lying
in wait, or murder in the second degree, or voluntary
manslaughter, or involuntary manslaughter, I do not
now express, or intend to express, or to be understood
as intimating any opinion. The killing may amount to
murder in the first degree, without being murder by
"lying in wait;" but whether it does so, or not, in this
case, I intimate no opinion, as it would be improper now
to do so. For the reasons I have stated, I think said
two instructions were not relevant to the case before
the jury, and were so framed that, in the condi-
tion the case stood before the jury, they might con-
fuse and mislead the jury. And these reasons apply
with equal force to so much of the instruction voluntari-
ly given by the judge to the jury as relates to killing by
lying in wait. There may be doubt that "murder
by lying in wait" and "killing by lying in wait,"
mean one and the same thing under our statute.
The statute reads: "Murder by poison, lying in wait,
imprisonment, starving, or any wilful, deliberate and
premeditated killing, &c., is murder in the first degree."
If they mean the same thing, why should the word "mur-
der" be used in the one connection and "killing" in the
other? If it be proved that the killing was of such a
character that, under ordinary circumstances, it would
have been murder at common law, and the fact of lying
in wait exist, that fact will make it a case of murder in

the first degree. *Riley v. The State*, 9 Hump. (Tenn.) 661. Can it be said that if the killing be proved, and the fact of "lying in wait" exist, that fact will make it a case of murder in the first degree? Does "lying in wait," as used in the statute, necessarily pre-suppose, or imply malice? Does not the statute mean that if a homicide is proven to have been committed with malice, the crime is murder in the second degree, but if it be shown, in addition, that the fact of "lying in wait" existed, the offense, for that reason, is raised to murder in the first degree? It is *held* in the said case of *Riley v. The State*, "Where a lying in wait is established, all proof as to 'intention' or 'wilfulness' is irrelevant, if the stroke be given under circumstances that would make it murder at common law. If a party strike with a deadly weapon, without provocation, intending to inflict the stroke, as a matter of law which he cannot dispute, he shall be held to intend the consequences; and if death ensue, it is murder. And in such cases, if a 'lying in wait' exist, it is murder in the first degree." This case would seem to imply that if a party strike with a deadly weapon, and with provocation, &c., under the same circumstances, the offense might not necessarily amount to murder in the first degree. In *Hill's Case*, 2 Gratt., on page 598, the General Court, in its opinion, delivered by judge Duncan, says: "Without designing to enter into a disquisition upon the terms of our statute creating the distinction of murder in the first degree, we shall content ourselves with the reasoning of the General Court in *Jones' Case*, 1 Leigh, 598, and adopt it. We also concur with the prisoner's counsel in their petition, that under our statute, every homicide is *prima facie* murder in the second degree, and in order to elevate the offense to murder in the first degree, the burden is cast upon the Commonwealth to bring it, by proof, either within the specific class of cases, such as killing by poison, or by lying in wait, &c., enumerated in the statute, or within the general class of wilful, deliberate and premeditated killing. On the

other hand, in order to reduce the offense from murder in the second degree to manslaughter, the burden is cast upon the accused." In that case there was no pretence of justification, excuse, threats, or prior attempts of violence of any kind, of the deceased, toward or upon the prisoner, shown or pretended, and nothing, whatever, is said in the opinion upon that subject. The first instruction, and the instruction voluntarily given by the court are to the effect that if the defendant killed Augustus Grass by lying in wait, then no previous threats or attempts at violence on the part of Grass can justify or excuse the act or reduce it from murder in the first degree.—These instructions, as given, might be construed by the jury to mean that if they believed the killing was done by "lying in wait," all previous threats or attempts at violence of Grass towards or upon the defendant, no matter how recent or what their character, should be excluded from their consideration, and that they were bound by the law to find the defendant guilty of murder in the first degree. The jury, it seems to me now, should be free to consider whether, from all the circumstances and facts, the crime of murder had been committed, and if so, whether it had been committed by lying in wait, or whether there was a wilful, deliberate and premeditated killing, or any less offense embraced by the indictment, and in determining these questions all the circumstances bearing upon or tending to shed light thereon should be carefully weighed and considered. But I do not, at this time determine the questions last above discussed, and arising upon the instructions, because it is not now necessary, and because they are of such great moment that they should be well and thoroughly considered, before finally adjudicated and settled. What I have said in regard to them has been to suggest thoughts which have occurred to me in relation thereto, which have not matured into conviction. The principles settled by the cases in 1 Leigh, and 2 Gratt., to which I have referred, seem to

have governed thus far, and I do not intend, by what I have suggested, to be understood as now dissenting from these principles. Nor do I understand these cases to settle fully and clearly the said questions. The instruction given by the court, on its own motion, might be construed as assuming that killing by "lying in wait" had been proven in the cause. In the instruction, the court, among other things, says: "Killing may be justifiable or excusable. In cases where the defense of justifiable homicide is claimed or set up, it is necessary for the defense to show: that there was immediate and pressing danger of life, limb, or great bodily harm; that he had reason to believe the act necessary to protect himself from this impending danger; that previous threats and attempts are not sufficient to justify killing." Taking this part of the instruction altogether, I do not think it expounds the law correctly, without some explanation, as a general rule cannot well be prescribed in such cases. It is true that previous threats or acts of hostility against the defendant, however violent they may be, will not of themselves justify him in seeking and slaying his adversary. To excuse the slayer, he must act under an honest belief that it is necessary at the time to take the life of his adversary in order to save his own; and it must appear there was reasonable cause to excite this apprehension. And to show that the defendant's fear was honest and in good faith, it should appear that the circumstances were such as would naturally create this apprehension in his mind, not that he was in actual danger. One party might assail another with a gun or pistol in such a manner as to create an honest belief in the mind of the latter, that his life was in instant peril, and yet it might, in reality, afterwards appear that the gun or pistol was not loaded, and the attack was really feigned. *Jackson v. The State*, before cited.

As there must be another trial of this case before a jury, I forbear to consider the question made by defendant's

bill of exceptions No. 6 as to whether the court erred in refusing to grant a new trial upon the ground that the verdict of the jury is contrary to law and the evidence. To express an opinion in advance of the trial, upon the sufficiency or insufficiency of the evidence to support the verdict, might work great injury and injustice to the State or the prisoner. It is therefore improper for this court now to express any opinion upon that subject.

I decide no question in this cause, except such as are assigned as error by the defendant in his assignment of errors in his petition mentioned, no other questions or errors having occurred to me or the court and our attention not being directed specially or otherwise to other errors by argument or assignment of error.

The court in rendering its judgment in the cause, as a part of its judgment, directed that the defendant (Abbott) should be removed from the jail of the county to the "Public Penitentiary," &c. The word "public" is not necessary to be used in this connection and may in all such cases be omitted.

Because of the errors of the said circuit court ascertained and determined in this opinion, this judgment of the said circuit court rendered in this cause on the 13th day of December 1873, against the defendant upon the verdict of the jury must be reversed and annulled and the verdict of the jury be set aside and a new trial be awarded.

The other judges concurred.

JUDGMENT REVERSED, VERDICT SET ASIDE AND NEW TRIAL AWARDED.