519 S.E.2d 852

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Mary Beth DAVIS, Defendant Below, Appellant.**

No. 25812.

Supreme Court of Appeals of West Virginia.

Submitted May 5, 1999.

Decided June 28, 1999.

Concurring Opinion of Chief Justice Starcher Sept. 8, 1999.

Mark Burnette, Esq., Prosecuting Attorney, Lewisburg, West Virginia, Attorney for the Appellee.

Franklin D. Cleckley, Esq., Morgantown, West Virginia, Paul S. Detch, Esq., Lewisburg, West Virginia, Attorneys for the Appellant.

MAYNARD, Justice:

This appeal was brought by Mary Beth Davis, defendant below, from the Circuit Court of Greenbrier County. The defendant appeals her convictions for attempt to injure her infant son by poison and first degree murder of her infant daughter. The circuit court sentenced the defendant to life imprisonment without parole for the murder conviction and to a consecutive sentence of 3–18 years imprisonment for the attempt to injure by poison conviction. In this appeal, the defendant assigns the following errors: (1) insufficiency of evidence to support the convictions, (2) failure to dismiss for pretrial indictment delay, (3) failure to instruct jury on malice, (4) failure to instruct on lesser included offenses, and (5) prosecutorial misconduct. For the following reasons, we affirm.

## I.

### STATEMENT OF FACTS

The record indicates that the defendant is married to Gary Davis.[1] The Davises were married on November 19, 1977. Two children were born to the marriage. The first child, Tegan, was born on February 27, 1979. The second child, Seth, was born on July 18, 1981. The defendant began her career as a registered nurse in 1972. Mr. Davis entered medical school at the West Virginia School of Osteopathic Medicine in Lewisburg, West Virginia in 1979.[2]

On September 30, 1981, the Davises rushed Seth to Greenbrier Valley Hospital after he appeared to have a seizure.[3] While at the hospital, blood was drawn from Seth and it showed a normal blood sugar level of 72. However, a test of his spinal fluid revealed an abnormal low reading of 11. It appears that Seth's condition was grave and after about three hours at the hospital, medical officials decided to have him flown to Pittsburgh Children's Hospital (PCH). Upon arrival at PCH, it was discovered that Seth had an abnormal and dangerous level of insulin in his body. The insulin level was 320. The treating physician at PCH, Dr. Dorothy Becker, concluded that someone had injected Seth with insulin.[4] Dr. Becker reported her suspicions to Seth's treating physician in West Virginia, Dr. Joseph Aldrich, and instructed Dr. Aldrich to report suspected child abuse to West Virginia officials. Dr. Aldrich did not make such a report. As a result of the large quantity of insulin in Seth's body, he sustained massive brain damage and severe retardation. At trial it was revealed that Seth lives in a state of vegetation.[5]

On March 10, 1982, the defendant rushed Tegan to Greenbrier Valley Hospital.[6] Tegan had been vomiting and complaining of burning of the urine. Tegan was admitted to the hospital. It appears that during the late evening hours of Tegan's admission, Nurse Helen M. Pack observed the defendant injecting something into Tegan. Nurse Pack testified regarding the incident as follows:

Q. Did there come a time during the evening that you observed the defendant give Tegan a shot?

A. Yes. At 2:15, Dr. Aldrich was out of the room, and Mary Beth came in, went

---

1. The Davises separated in 1985 but never divorced.

2. Mr. Davis graduated from the school and is now a practicing physician.

3. Prior to this incident Seth had been treated for lethargy at the West Virginia School of Osteopathic Medicine by Dr. Joseph Aldrich. At the time of the seizure the Davises were preparing to take Seth to a medical specialist in Pittsburgh.

4. The drug had not been prescribed for Seth.

5. Seth cannot walk, speak, see, hear or eat solid food. Seth has been institutionalized.

6. Trial testimony indicated that Mr. Davis was not at home when Tegan was taken to the hospital.

over to Tegan and gave her a shot. And I said, "Well, what was that Mary Beth?" And she said, "That was thiamine." She says, "Now, you can chart that it was 100 milligrams of thiamine."

Q. Did you chart it?

A. I said, "Mary Beth, I can't chart that's 100 milligrams of thiamine, because I didn't give it and I don't know for sure what's in there."

Q. Did you try to determine what was in the syringe?

\* \* \*

Q. Can a registered nurse give a shot without an order?

A. On her own? Not unless the doctor leaves like an order to say, "use this if necessary." But there has to be some sort of a—or some standing order, what they called "standing orders," that he leaves with the patient, that if you need these, you can use anything on this list, and write it as an order. It's like a standing order. But he didn't have any standing orders for Tegan.

\* \* \*

Q. If a doctor was going to order a shot to be given, who would he order to do it?

A. I would be the one to give it. Mary Beth, she was an R.N., but at that point, she was the child's mother. I was the nurse in charge. I was the one to be caring for the child.

Q. Have you ever known a doctor to give an order for a mother to inject a patient?

A. Not unless it would be something at home. Not in the hospital, no.[7]

Tegan took a turn for the worse at some point after being injected with a substance by the defendant. On the morning of March 12, 1982, plans were made to transfer Tegan to a larger hospital, however Tegan died in the ambulance before it reached the hospital, and she was brought back to Greenbrier Valley Hospital.

7. At trial, the defendant testified that she gave Tegan the shot with Dr. Aldrich's approval.

8. The evidence indicated that the empty blister pack contained diet pills that were composed of caffeine.

An autopsy was performed on Tegan by Dr. Anne Hooper. Dr. Hooper reported that Tegan's death was a homicide caused by caffeine overdose. Dr. Hooper found inside of Tegan's stomach "beads" of caffeine pills which had been contained in pill capsules. Dr. Hooper opined that because of the lethal quantity of caffeine found in Tegan's intestinal tract, the child had to have been fed the pills over a short period of time. On the evening of Tegan's death, Mr. Davis discovered an empty blister pack, that had contained diet capsule pills, in a tied-up garbage bag on his back porch.[8]

Law enforcement officials began an investigation into Tegan's death in 1982, but halted it at some point prior to 1985. The case was reopened in 1995. In November of 1996, a grand jury returned an indictment charging the defendant with attempting to injure Seth by poison and first degree murder of Tegan.[9] The defendant was subsequently convicted and sentenced on both charges. This appeal was prosecuted assigning the following as errors: (1) insufficiency of evidence to support the convictions, (2) failure to dismiss for pretrial indictment delay, (3) failure to instruct jury on malice, (4) failure to instruct on lesser included offenses, and (5) prosecutorial misconduct.

## II.

## DISCUSSION

### A.

### *Insufficiency of Evidence*

The defendant's first assignment of error is that the State's evidence was insufficient to support her convictions. This Court set out the standard of review for a sufficiency of the evidence claim in *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). We held in Syllabus Point 1 of *Guthrie* that:

9. There was also a charge of attempting to injure Tegan by poison.

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.[10]

We further elaborated in Syllabus Point 3 of *Guthrie*, in part, that:

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

The record shows that the defendant's convictions were based upon circumstantial evidence. This Court has previously ruled that we may accept any adequate evidence, including circumstantial evidence, as support for a conviction. *Guthrie*, 194 W.Va. at 668, 461 S.E.2d at 174. It was noted in *Guthrie* that:

Circumstantial evidence ... is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some case point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

*Guthrie*, 194 W.Va. at 668, 461 S.E.2d at 174, *quoting*, *Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150, 166 (1954). With these principles in view, we will examine the evidence for sufficiency separately as to each conviction.

### 1. Conviction for attempted poisoning of Seth.

■ The record in this case is clear that Seth lives in a state of vegetation. The evidence is clear that prior to September 30, 1981, Seth's physical condition was not that of vegetation. The State presented evidence to show that on the morning of September 30, 1981, the defendant was at home alone with Seth and Tegan. Mr. Davis disputed this fact at trial and testified that he believed he was home with the defendant. However, the State presented a statement that Mr. Davis gave to an investigating officer wherein Mr. Davis indicated he received a call at the Osteopathic School from the defendant telling him to come home because Seth was ill. The State also called the "rotation" record keeper from the Osteopathic School to testify that Mr. Davis was on rotation with a Dr. Andrew McKenzie (now deceased) on September 30, 1981. The State also produced a record showing the defendant contacted the Osteopathic School at 10:45 a.m. on September 30, 1981 and left a message that Seth was in seizure. The jury's verdict shows that it did not believe Mr. Davis's testimony on this issue.

---

10. A motion for judgment of acquittal is reviewed under the same standard as articulated in Syllabus Point 1 of *State v. Fischer*, 158 W.Va. 72, 211 S.E.2d 666 (1974):

Upon motion to direct a verdict for the defendant, the evidence is to be viewed in light most favorable to prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt.

■ The record shows that Mr. and Mrs. Davis took Seth to Greenbrier Valley Hospital on September 30, 1981.[11] Seth was eventually flown to PCH. While at PCH, Dr. Becker discovered that Seth had an abnormal and dangerous level of insulin in his body. Dr. Dorothy Becker concluded that someone had injected Seth with insulin and advised the child's treating physician in West Virginia, Dr. Aldrich, to report suspected child abuse to West Virginia officials.[12] Dr. Aldrich did not make such a report.[13] As a result of the large quantity of insulin in Seth's body, he sustained massive brain damage and severe retardation.[14]

At the trial, Dr. Becker stood by her previous conclusion and testified that Seth was injected with a dangerous level of insulin. Dr. Becker's conclusion was concurred with by Dr. Basil Zitelli, Dr. Sharon McGregor, who also treated Seth at PCH, Dr. Irvin Sopher and Dr. Gregory H. Wallace.[15] The defendant presented expert testimony that

suggested the high insulin level in Seth was due to glucose that was administered to him at PCH. Evidence was also presented by the defendant which suggested Seth was suffering from Leigh's Disease (a rare neurometabolic disorder).[16] However, the evidence was contradictory as to whether Seth was ever diagnosed as actually having Leigh's Disease.

In looking at the evidence in the light most favorable to the State, we are unable to conclude that a rational jury could not find the essential elements of the crime proved beyond a reasonable doubt.

## 2. Conviction for first degree murder of Tegan.

■ The State presented evidence that Tegan was a healthy child and that on March 11, 1982, she died. Dr. Hooper, the pathologist who performed the autopsy on Tegan, testified that massive amounts of beads were found in Tegan's stomach. This was confirmed by Dr. Hooper's assistant on the autopsy, Katherine Donavan. Dr. Hoo-

11. The record indicates that the defendant was a nurse at Greenbrier Valley Hospital and that she had access to insulin at the hospital.

12. Evidence was introduced to show that Seth was not diabetic and that insulin was not prescribed for him.

13. The State also presented evidence to show that Dr. Becker forwarded a letter to Dr. Aldrich indicating that Seth was a victim of exogenous insulin administration and advising him to report the matter as child abuse. It was also shown that the letter was not in the subpoenaed files of Dr. Aldrich.

The State attempted to show that Dr. Aldrich's conduct was due to an affair he was having with the defendant. Dr. Aldrich denied such and the defendant testified on this issue as follows:
Q. What was your relationship at that time with Dr. Aldrich, that is, after you brought Seth home?
A. He was my son and daughter's pediatrician.
Q. Was it strictly a professional relationship?
A. At that particular time, yes.
A nurse, Carol M. Beckett, testified regarding the relationship between Dr. Aldrich and the defendant, as follows:
Q. Did you ever observe the relationship between Dr. Aldrich and the defendant?
A. I know they talked to each other on the phone a lot, because I took the calls and would have them transferred, primarily at nighttime.
＊　＊　＊
Q. Did you think that unusual in any way?

A. I did. Because I knew her husband was on rotation when the calls were coming in. I also used to wonder who was taking care of the children at nighttime.

14. "In order to constitute the crime of attempt, two requirements must be met: (1) a specific intent to commit the underlying substantive crime; and (2) an overt act toward the commission of that crime, which falls short of completing the underlying crime." Syl. Pt. 4, *State v. Mayo*, 191 W.Va. 79, 443 S.E.2d 236 (1994). *See also*, Syl. Pt. 2, *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978), *overruled on other grounds, State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

15. The State produced numerous witnesses who testified regarding the defendant's behavior after Seth took ill. There was witness testimony concerning the defendant buying a casket for Seth and stating that if he did not die soon he would outgrow the casket. There was testimony that the defendant believed Seth was injected with insulin, but that it must have been done while en route to PCH or at PCH.

16. The defendant introduced testimony that suggested Seth had human growth hormone deficiency, a form of Leigh's Disease. The State rebutted this evidence through Dr. George Haddad, the physician caring for Seth while he is institutionalized. Dr. Haddad attributed Seth's stunted growth to factors associated with never eating solid food and being in a state of vegetation.

per testified that the beads were composed of caffeine and that Tegan's death was a homicide caused by caffeine poisoning. Dr. Hooper's conclusion as to cause of death was concurred with by Dr. Sopher, Dr. Elizabeth J. Scharman, Dr. Zitelli and Dr. Wallace. There was evidence that an empty blister pack that had contained diet pills was found tied up in a garbage can at the defendant's residence, and that the diet pills contained caffeine. The State also produced evidence showing that the defendant was seen injecting a substance in Tegan while she was hospitalized. There was also evidence that Dr. Aldrich and the defendant disposed of the contents of Tegan's stomach that had been previously sucked out by an N.G. tube.[17] The defendant presented expert testimony suggesting Tegan had a liver disease and that she died from Reye's Syndrome.

In looking at the evidence in the light most favorable to the State, we are unable to conclude that a rational jury could not find the essential elements of the crime proved beyond a reasonable doubt.

## B.

### Failure to Dismiss for Pretrial Indictment Delay

The record indicates that Seth was injured in September of 1981 and that Tegan died in March of 1982. The defendant's indictment for these incidents did not come until approximately 15 years later on November 12, 1996. At trial, the defendant filed a motion to dismiss the indictment on the grounds that the pre-indictment delay violated her due process rights under the State and federal constitutions.[18] The trial court denied the motion after holding an evidentiary hearing on the matter. The defendant now argues that it was error for the trial court to deny the motion to dismiss.

Our standard of review of a motion to dismiss an indictment is generally *de novo*. However, in addition to the *de novo* standard of review, where an evidentiary hearing is conducted upon a motion to dismiss this Court's "clearly erroneous" standard of review is ordinarily invoked concerning a circuit court's findings of fact. *See* generally, *Town of Fayetteville v. Law,* 201 W.Va. 205, 495 S.E.2d 843 (1997); *McCormick v. Allstate Insurance Company,* 197 W.Va. 415, 475 S.E.2d 507 (1996).

We observe at the outset that "West Virginia has no statute of limitations affecting felony prosecutions." *State v. Carrico,* 189 W.Va. 40, 43, 427 S.E.2d 474, 477 (1993). It was said in *Hoffa v. United States,* 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966), that "[t]here is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect.... Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." In Syllabus Point 1 of *State ex rel. Leonard v. Hey,* 269 S.E.2d 394 (1980), we held:

A delay of eleven years between the commission of a crime and the arrest or indictment of a defendant, his location and identification having been known throughout the period, is presumptively prejudicial to the defendant and violates his right to due process of law, U.S. Const. Amend. XIV, and W.Va. Const. art. 3, § 10. The presumption is rebuttable by the government.

We further ruled in Syllabus Point 2 of *Leonard* that "[t]he effects of less gross delays

---

17. Several nurses testified that it was unprecedented for a doctor or a parent or a patient to clean up a patient's stomach contents. There was also testimony that Dr. Aldrich and the defendant were alone in the room while they were disposing of Tegan's stomach contents.

18. "[T]he constitutional right to a speedy trial does not arise until the defendant is charged or arrested." *Hundley v. Ashworth,* 181 W.Va. 379, 381, 382 S.E.2d 573, 575 (1989), citing, *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). *See also,* Syl. Pt. 2, *State v. Drachman,* 178 W.Va. 207, 358 S.E.2d 603 (1987) (holding in part that "[i]n those situations where there has been no arrest or indictment, the Sixth Amendment right to a speedy trial is not implicated").

upon a defendant's due process rights must be determined by a trial court by weighing the reasons for delay against the impact of the delay upon the defendant's ability to defend himself."

To rebut the presumption of prejudice established in *Leonard*, we held in *Hundley v. Ashworth*, 181 W.Va. 379, 383, 382 S.E.2d 573, 576–77 (1989) that the State need only demonstrate the delay was not orchestrated to gain a tactical advantage over the defendant. If the State is able to make such a showing, the delay in obtaining the indictment does not violate federal or state due process. However, this Court pointed out in *Hundley* that the burden-shifting mechanism announced in *Leonard* is not applicable where "the prosecutor was not shown to have knowledge of the identity and location of the defendant."[19] *Id.* at 382, 382 S.E.2d at 576. Specifically, we stated in Syllabus Point 2 of *Hundley*:

> The Due Process Clause of the Fifth Amendment to the United States Constitution and Article III, Section 10 of the West Virginia Constitution require the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the State's delay in bringing the indictment was a deliberate device to gain an advantage over him and

that it caused him actual prejudice in presenting his defense.

*Accord, State v. Beard,* 194 W.Va. 740, 461 S.E.2d 486 (1995) (thirteen-year delay between the murders and defendant's indictment did not violate due process because the State promptly charged defendant once it had the necessary grounds to secure an indictment); and *State v. Carrico,* 189 W.Va. 40, 427 S.E.2d 474 (1993) (holding that two-year pre-indictment delay did not violate defendant's due process rights since government promptly sought indictment upon securing sufficient evidence).[20] In the instant proceeding, the defendant contends that this case is subject to a *Leonard* analysis. However, we find that *Hundley's* analysis is the appropriate test because the defendant has not shown that the State knew the identity of the person who murdered Tegan and attempted to poison Seth prior to the new investigation in 1995.[21] Accordingly, the defendant must "prove that the State's delay in bringing the indictment was a deliberate device to gain an advantage over [her] and that it caused [her] actual prejudice in presenting [her] defense." *Hundley,* 181 W.Va. at 383, 382 S.E.2d at 577 (footnote omitted).[22]

A review of the record indicates that the defendant failed to present any evidence at the pretrial hearing to establish that the State deliberately delayed bringing the

19. In *Leonard* the defendant murdered one victim and severely wounded a second victim during a robbery. The defendant (and a co-defendant) was only indicted for the murder and robbery, but not for injuring the other victim. The defendant entered a plea of guilty to first degree murder. Under the plea agreement the robbery charge was dropped. The defendant was sentenced to life in the penitentiary without recommendation of mercy in 1968. About seven years after being sentenced, the Governor commuted the defendant's sentence to life with mercy, thereby making the defendant eligible for parole in 1979. In 1979 the defendant was indicted for maliciously wounding the second victim. After the trial court denied the defendant's motion to quash the indictment, he filed for a writ of prohibition to this Court. It was noted in the opinion of *Leonard* that the state had all its evidence on the wounding charge at the time it prosecuted the defendant on the murder charge. We remanded the case to the trial court to give the state an opportunity to justify the delay by proving its reasonableness.

20. "It is the government's duty to proceed with reasonable diligence in its investigation and preparation for arrest, indictment and trial. If it fails to do so after discovering sufficient facts to justify indictment and trial, it violates this due process right." Syl. Pt. 1, *State v. Carrico,* 189 W.Va. 40, 427 S.E.2d 474 (1993).

21. At the pretrial hearing on the motion to dismiss for pre-indictment delay the trial court applied *Hundley's* analysis after finding the defendant failed to show that the State knew the identity of the person who murdered Tegan and attempted to poison Seth, prior to the new investigation in 1995.

22. In Syllabus Point 1 of *State v. Richey,* 171 W.Va. 342, 298 S.E.2d 879 (1982), we held that "[t]he general rule is that where there is a delay between the commission of the crime and the return of the indictment or the arrest of the defendant, the burden rests initially upon the defendant to demonstrate how such delay has prejudiced his case if such delay is not *prima facie* excessive."

charges against her in an effort to gain a tactical advantage. The State presented evidence to show that the initial investigating officer, Jim Childers, and prosecuting attorney, Ralph Hayes (now deceased), concluded that the evidence was insufficient to charge anyone for Tegan's murder and Seth's attempted poisoning. It appears that a primary obstacle to bringing charges was the fact that Mr. Davis had refused to talk with law enforcement officials about the incident. The evidence showed that it was not until Trooper Michael Spradlin began his investigation in 1995, that Mr. Davis decided to talk with law enforcement. According to Trooper Spradlin, Mr. Davis informed him that the defendant was alone with Seth when he became ill and that she was alone with Tegan when Tegan became ill.[23] These facts, along with subsequent inconsistent statements attributed to the Davises during their adoption of a child, provided the State with the missing pieces to bring charges against the defendant.

As to the issue of prejudice caused by preindictment delay, the defendant presents a number of theories in her brief. However, the State correctly points out that many of these arguments were not presented to the trial court. This Court pointed out in *State v. Miller*, 197 W.Va. 588, 597, 476 S.E.2d 535, 544 (1996) that:

> Ordinarily, a defendant who has not proffered a particular claim or defense in the trial court may not unveil it on appeal. Indeed, if any principle is settled in this jurisdiction, it is that, absent the most extraordinary circumstances, legal theories

not raised properly in the lower court cannot be broached for the first time on appeal. We have invoked this principle with a near religious fervor. This variant of the 'raise or waive' rule cannot be dismissed lightly as a mere technicality. The rule is founded upon important considerations of fairness, judicial economy, and practical wisdom.

In view of *Miller*, we will only pass upon those claims of prejudice argued before the trial court. In the defendant's memorandum of law to her motion to dismiss for preindictment delay she contended that the delay prejudiced her defense with respect to insulin testing done on Seth. It was argued by the defendant that the lab technician was not known and available for examination, lab log books were not available, and the type of machinery and protocol followed were not known. The defendant also proffered that "there is a reasonable possibility that there may have existed for a reasonable period of time, a sample of the blood specimen that could be tested by independent laboratories on behalf of the defendant."[24] The defendant opined that it might have been possible to reveal flaws in the testing done on the insulin level that was found. With respect to prejudice in defending against the murder charge, the defendant contended below that samples taken from Tegan's intestinal tract were not available for independent testing to determine whether the beads found in her stomach in fact contained caffeine.[25] On the issue of prejudice, the trial court ruled as follows: "There has been mention of prejudice to the defendant. There has not been

---

23. There was also evidence that the State became cognizant of a medical theory which could establish the motive for the crimes. The theory, Munchausen's by Proxy Syndrome, appears to have been discovered in 1977, but was not widely known until the late 1980's. The substance of Munchausen's by Proxy Syndrome is that a parent will harm a child in order to bring attention and sympathy to the parent. Insofar as this theory relates to motive, and motive is not an element of an offense, we are not persuaded that this evidence supports the delay in bringing charges. Additionally, there was evidence that a newly developed test called C-peptide test was used to strengthen Dr. Becker's conclusion that Seth was injected with insulin. This evidence is also not persuasive justification, because Dr. Becker testified that her initial conclusion would

not have changed even without the development of the C-peptide test.

24. The record in this case shows that on the date of the pretrial hearing on the motion to dismiss for pre-indictment delay, the defendant withdrew a motion she filed seeking an independent analysis of Seth's blood. The State's brief points out that independent testing was done on Seth by Dr. Paige Kaplan, who was not called as a witness.

25. The record in this case shows that on the date of the pretrial hearing on the motion to dismiss for pre-indictment delay, the defendant withdrew a motion she filed seeking an independent analysis of tissue samples of Tegan.

any showing of prejudice." In view of the record in this case, we cannot conclude that the trial court was clearly erroneous in its factual conclusion.

## C.

### Failure to Instruct Jury on Malice

■■■■■ The defendant argues next that the trial court committed reversible error in failing to include the element of "malice" in its instruction on the murder charge.[26] We have held that "[t]he trial court must instruct the jury on all essential elements of the offenses charged, and the failure of the trial court to instruct the jury on the essential elements deprives the accused of his fundamental right to a fair trial, and constitutes reversible error." Syllabus, *State v. Miller,* 184 W.Va. 367, 400 S.E.2d 611 (1990). In Syllabus Point 4 of *Guthrie, supra,* we stated:

A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific

instruction will be reviewed only for an abuse of discretion.

■■■■ The problem presented by the defendant's argument is that she failed to object to the instruction given by the trial court on the elements required to be proven. "The general rule is that a party may not assign as error the giving of an instruction unless he objects, stating distinctly the matters to which he objects and the grounds of his objection." Syl. Pt. 3, *State v. Gangwer,* 169 W.Va. 177, 286 S.E.2d 389 (1982). *See State v. Milam,* 159 W.Va. 691, 702, 226 S.E.2d 433, 441 (1976) ("[W]e will not consider an objection to instructions in the first instance before this Court"). Moreover, the pertinent language in Rule 30 of the West Virginia Rules of Criminal Procedure provides that "[n]o party may assign as error the giving or the refusal to give an instruction or the giving of any portion of the charge unless that party objects thereto before the arguments to the jury are begun[.]" *See State v. Schofield,* 175 W.Va. 99, 331 S.E.2d 829 (1985).

■■■■ This Court is not only concerned with defense counsel's failure to object to the instruction given on the elements of the murder charge; our review of the jury instruction hearing shows that the State and defense counsel specifically discussed with the trial court the type of language to be given on the elements of the murder by poison offense. At no time did defense counsel indicate that it had an objection to the charge as it was intended to be given. The defendant asks that this Court invoke the plain error doctrine to review this assignment of error.[27] We held in Syllabus Point 7 of *State*

---

26. First degree murder by poisoning is set out in W.Va.Code § 61-2-1 (1991) as follows:

 Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four [§ 60A-4-401 et seq.], chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

 In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the

death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.

27. "The plain error doctrine contained in Rule 30 and Rule 52(b) of the West Virginia Rules of Criminal Procedure is identical. It enables this Court to take notice of error, including instructional error occurring during the proceedings, even though such error was not brought to the attention of the trial court. However, the doctrine is to be used sparingly and only in those circumstances where substantial rights are affected, or the truth-finding process is substantial-

*v. Miller,* 194 W.Va. 3, 459 S.E.2d 114 (1995) that "[t]o trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." For the following reasons, we find no error in the trial court's jury instructions.

 As noted above, the defendant was convicted of first degree murder under W.Va.Code § 61-2-1. In Syllabus Point 5 of *State v. Sims,* 162 W.Va. 212, 248 S.E.2d 834 (1978), this Court explained:

W.Va.Code, 61-2-1, was not designed primarily to define the substantive elements of the particular types of first degree murder, but rather was enacted to categorize the common law crimes of murder for the purpose of setting degrees of punishment.

We further explained:

Our statute enumerates three broad categories of homicide constituting first degree murder: (1) murder by poison, lying in wait, imprisonment, starving; (2) by any wilful, deliberate and premeditated killing; (3) in the commission of, or attempt to commit, [*inter alia* ],[28] arson, [sexual assault], robbery or burglary.

*Sims,* 162 W.Va. at 221, 248 S.E.2d at 840 (footnote added). Under W.Va.Code § 61-2-1, "every homicide is *prima facie* murder in the second degree, and in order to elevate the offense to murder in the first degree, the burden is cast upon the [State] to bring it, by proof, either within the specific class of cases, such as killing by poison ... enumerated in the statute, ... within the general class of wilful, deliberate and premeditated killing[,]" or within the felony murder rule. *State v. Abbott,* 8 W.Va. 741, 771 (1875).

Prior to examining the category of first degree murder under which the defendant was convicted, we deem it useful first to briefly review the remaining portions of the statute. According to the statute, murder by any willful, deliberate and premeditated killing is murder of the first degree. Our cases have held that to sustain a conviction for this category of first degree murder it is essential that "the State produce[ ] evidence that the homicide was a result of malice ... and was deliberate and premeditated[.]" Syl. Pt. 3, in part, *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402 (1982). *See also,* Syl. Pt. 2, *State v. Jenkins,* 191 W.Va. 87, 443 S.E.2d 244 (1994). We observed in *State v. Guthrie,* 194 W.Va. 657, 673-74, 461 S.E.2d 163, 179-180, "that the elements that separate first degree murder and second degree murder are deliberation and premeditation in addition to the formation of the specific intent to kill." *See Miller,* 197 W.Va. at 600, 476 S.E.2d at 547 ("It is 'deliberation' that separates first degree murder from second degree murder"); *Hatfield,* 169 W.Va. at 198, 286 S.E.2d at 407 ("[T]he specific intent to kill for first degree murder is related to and is a necessary constituent of the elements of premeditation and deliberation"). In Syllabus Point 6 of *Guthrie,* in part, we indicated that "[i]n criminal cases where the State seeks a conviction of first degree murder based on premeditation and deliberation, a trial court should instruct the jury that murder in the first degree consists of an intentional, deliberate, and premeditated killing which means that the killing is done after a period of time for prior consideration."

 W.Va.Code § 61-2-1 also includes the codification of the common law felony murder rule. Felony murder does not "require proof of the elements of malice, premeditation or specific intent to kill. It is deemed sufficient if the homicide occurs during the commission of, or the attempt to commit, one of the enumerated felonies." *State v. Sims,* 162 W.Va. at 223, 248 S.E.2d at 841 (citations omitted). This Court has explained that the felony murder rule "requires the State to prove ... that defendant committed or attempted to commit the named felony and that he committed murder

---

ly impaired, or a miscarriage of justice would otherwise result." Syl. Pt. 6, *State v. Mayo,* 191 W.Va. 79, 443 S.E.2d 236 (1994). *See also,* Syl. Pt. 4, *State v. England,* 180 W.Va. 342, 376 S.E.2d 548 (1988).

28. W.Va.Code § 61-2-1, as amended since *Sims,* includes additional felonies within the felony murder rule. *See* footnote 26.

incidental thereto." Syllabus Point 3, in part, *State ex rel. Peacher v. Sencindiver*, 160 W.Va. 314, 233 S.E.2d 425 (1977).

▐ This Court has had few occasions to consider the category of first degree murder under which the defendant was convicted. According to the statute, "[m]urder by poison, lying in wait, imprisonment, starving . . . is murder of the first degree." In the ancient case of *State v. Abbott*, 8 W.Va. 741 (1875), this Court considered the elements of first degree murder by lying in wait. The Court concluded in *Abbott* that the term "murder by poison, lying in wait, imprisonment, starving" does not require a showing of premeditation or a specific intent to kill. Rather, to elevate a murder by one of the four enumerated acts to first degree murder, the State must prove only malice plus one of the four acts.

> If it be proved that the killing was of such a character that, under ordinary circumstances, it would have been murder at common law, and the fact of lying in wait exist, that fact will make it a case of murder in the first degree. . . . "Where a lying in wait is established, all proof as to 'intention' or 'wilfulness' is irrelevant[.]"

*Abbott*, 8 W.Va. at 770–771 (citation omitted). *See also, State v. Sims, supra.* In reliance on *Abbott*, this Court later held in a case also involving lying in wait:

> In order to sustain a conviction for first degree murder by lying in wait pursuant to *W.Va.Code*, 61–2–1 [1987], the prosecution must prove that the accused was waiting and watching with concealment or secrecy for the purpose of or with the intent to kill or inflict bodily harm upon a person.

Syllabus Point 2, in part, *State v. Harper*, 179 W.Va. 24, 365 S.E.2d 69 (1987). *See also,* Syllabus Point 1, *State v. Walker*, 181 W.Va. 162, 381 S.E.2d 277 (1989) (per curiam). It is obvious, therefore, that in order to elevate a murder by one of the four enumerated acts in W.Va.Code § 61–2–1 to first degree murder, it is not necessary to prove specific intent to kill, deliberation and premeditation. The State must prove, rather, that the accused committed one of the four enumerated acts, and that he or she did so with malice.

Regarding the meaning of the term "malice," in *State v. Douglass*, 28 W.Va. 297, 299 (1886), this Court opined:

> [T]he source of which said malice is not only confined to a particular ill will to the deceased, but is intended to denote . . . an action flowing from a wicked and corrupt motive, a thing done *malo animo*, where the fact has been attended with such circumstances as carry in them the plain indications of a heart regardless of social duty, and fatally bent on mischief.

In *State v. Starkey*, 161 W.Va. 517, 524, 244 S.E.2d 219, 223 (1978), *overruled on other grounds, State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), we stated that "[t]he term malice has been frequently used, but not extensively defined, by this Court[,]" and concluded that "malice is essentially a form of criminal intent[.]" *Id.*, 161 W.Va. at 523, 244 S.E.2d at 223. For example, "in regard to first degree murder, the term 'malice' is often used as a substitute for 'specific intent to kill' or an 'intentional killing.'" *State v. Hatfield*, 169 W.Va. at 198, 286 S.E.2d at 407 (citation omitted). In order to determine whether the trial court properly instructed the jury on malice or criminal intent, we first must decide what form of criminal intent is required as an element of murder by poison.

Concerning the specific crime of murder by poison at issue in the instant case, this Court has not previously spoken. As noted above, the plain language of the statute indicates that in order to elevate murder by poison to first degree murder, there must be both a murder, the unlawful killing of another with malice aforethought, *and* the act of the administration of poison. In other words, if the State proves that the killing was such that it would have been murder at common law, and the murder was accomplished by the administration of poison, W.Va.Code § 61–2–1 elevates the common law murder to murder in the first degree. Under the common law, "[t]he homicide must first amount to murder, either because the defendant had an intent to kill or do serious bodily injury, or because his conduct evinced a depraved heart, or because the death by poison resulted from the defendant's commission or attempted commission of a felony."

Wayne R. LaFave and Austin W. Scott, Jr., *Handbook On Criminal Law* § 73, p. 567 (1972) (footnote omitted). Concerning the act of administering poison, "[i]t is not necessarily murder by poison to kill another person with poison, as where one administered poison innocently and for a lawful purpose and yet produces a death." *Id.* (footnote omitted). Based on the foregoing, we conclude that the malice required to constitute murder by poison includes an intent to kill, intent to do serious bodily harm or conduct which evinces a depraved heart.[29] Further, we conclude that the administration of poison must be done intentionally, willfully and unlawfully.

■ Accordingly, we hold that specific intent to kill, premeditation and deliberation are not elements of the crime of first degree murder perpetrated by means of poison pursuant to W.Va.Code § 61–2–1 (1991). Rather, in order to sustain a conviction for first degree murder by poison pursuant to W.Va. Code § 61–2–1, the State must prove that the accused committed the act of administration of poison unlawfully, willfully and intentionally for the purpose of or with the intent to kill or do serious bodily injury, or that the accused's conduct evinced a depraved heart.

We now apply this rule to the facts before us. The trial court instructed the jury, in part, as follows:

> The Court instructs the jury that according to West Virginia law, murder of the first degree is committed when one person kills another person by unlawfully,

willfully, and intentionally administering poison to that person.

> * * *

> The Court instructs the jury that one of the elements of [the crime] charged against the defendant is the element of specific intent .... [I]n order to convict the defendant of murder of the first degree of her daughter ... the jury must find that she intended to poison her. It is also necessary that the defendant intended to kill or do serious bodily injury to her daughter or that she did so because her conduct evinced a depraved heart.

Clearly, this instruction complies with our law on first degree murder by poison. In Syllabus Point 6 of *State v. Milam*, 159 W.Va. 691, 226 S.E.2d 433 (1976), we held that instructions are sufficient which, when read as a whole, adequately advise the jury of all necessary elements for their consideration. This instruction includes the requisite elements of unlawful, willful, and intentional administration of poison. Further, the instruction sets forth the requisite criminal intent by mandating that the administration of poison be committed with the intent to kill or do serious injury.[30] Accordingly, we find no error in this jury instruction.[31]

## D.

### Failure to Instruct on Lesser Included Offenses

■ The fourth assignment of error raised by the defendant is that the circuit court erred when it failed to instruct the jury on the lesser included offense of involuntary manslaughter. According to the defendant,

29. Death by poison resulting from the defendant's commission or attempted commission of a felony appears to be covered by the felony murder rule in W.Va.Code § 61–2–1.

30. The trial court also instructed the jury as follows:

> In order to convict the defendant of murder in the first degree, the State of West Virginia must overcome the presumption that the defendant is innocent and must prove beyond a reasonable doubt to the satisfaction of the jury the following elements: One, that on or about March 7th to the 10th, 1982; Two, in Greenbrier County, West Virginia; Three, the defen-

dant, Mary Beth Davis; Four, unlawfully; Five willfully and intentionally; Six, administered a poison; Seven, to the victim, Tegan Marie Davis; Eight, which resulted in the death of; Nine, Tegan Marie Davis; Ten, and at the time of administering the poison, the defendant had the intent to kill or do serious bodily injury or did so because her conduct evinced a depraved heart.

31. The appellant also claims that the trial court committed reversible error by constructively amending the indictment. In light of our holding above, we find no merit to this contention. Also, we believe the indictment conforms to the requirements of W.Va.Code § 61–2–1.

if upon any view of the facts, a defendant properly could be found guilty of a lesser offense, the trial court must submit such lower offense. In the instant case, the evidence presented by the prosecution was that the defendant administered time-released caffeine over a several day period which ultimately amounted to a lethal level of caffeine. The defendant contends that the jury could have found that she administered the caffeine merely to cause sickness, but not to kill, which would have mandated an involuntary manslaughter verdict. The State counters that there is no error because the defendant denied any involvement in the murder of her daughter, and the evidence supports only first degree murder pursuant to W.Va.Code § 61-2-1.

 We note first that the defendant failed to object at trial to the verdict form. Therefore, we will analyze this assignment of error under the plain error doctrine discussed *infra.* We are mindful that "a trial court must give an instruction for a lesser included offense when evidence has been produced to support such a verdict." *State v. Stalnaker,* 167 W.Va. 225, 227, 279 S.E.2d 416, 417 (1981), *citing State v. Cobb,* 166 W.Va. 65, 272 S.E.2d 467 (1980). Further, "it is reversible error for a trial court to refuse to instruct a jury on lesser offenses charged in the indictment if there is any evidence in the record to prove such lesser offenses[.]" *State v. Wayne,* 162 W.Va. 41, 46, 245 S.E.2d 838, 842 (1978), *overruled on other grounds, State v. Kopa,* 173 W.Va. 43, 311 S.E.2d 412 (1983).

 In Syllabus Point 1 of *State v. Jones,* 174 W.Va. 700, 329 S.E.2d 65 (1985), this Court held:

The question of whether a defendant is entitled to an instruction on a lesser included offense involves a two-part inquiry. The first inquiry is a legal one having to do with whether the lesser offense is by virtue of its legal elements or definition included in the greater offense. The second inquiry is a factual one which involves a determination by the trial court of whether there is evidence which would tend to prove such lesser included offense. (Citation omitted).

It is not necessary to analyze the first step in this inquiry because it is settled that involuntary manslaughter is a lesser included offense of murder. *See State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995) and *State v. McGuire,* 200 W.Va. 823, 490 S.E.2d 912 (1997). Therefore, we now proceed to consider whether there was evidence presented at trial that would tend to prove that the defendant committed involuntary manslaughter. In making this determination, we look only to the evidence concerning the element of murder that distinguishes it from involuntary manslaughter. That element is intent. "The defendant's intent . . . is not an element of the crime of involuntary manslaughter." *State v. Comstock,* 137 W.Va. 152, 174, 70 S.E.2d 648, 660 (1952). Rather, "[a] person may be guilty of involuntary manslaughter when he performs a lawful act in an unlawful manner, resulting in the unintentional death of another." *Id.* (Citation omitted). In Syllabus Point 5 of *State v. Demastus,* 165 W.Va. 572, 270 S.E.2d 649 (1980), this Court stated that "[j]ury instructions on possible guilty verdicts must only include those crimes for which substantial evidence has been presented upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." The dispositive issue, therefore, is whether substantial evidence was presented below upon which the jury might have found the defendant guilty of involuntary manslaughter. We find that no such evidence was presented.

The indictment in the case originally charged the defendant, in regard to the death of Tegan Marie Davis, with attempt to injure by poison in addition to first degree murder of Tegan. However, prior to trial, the State moved the circuit court to dismiss the attempt to injure count, and the circuit court granted the motion. Accordingly, pertaining to Tegan's death, the defendant was charged in the indictment only with the first degree murder of Tegan. Also, the State's sole theory at trial was that the defendant murdered the victim by the administration of a lethal amount of caffeine. In addition, the defendant denied all involvement in murdering the victim. Finally, we do not agree with the defendant that the jury could have found that the defendant intentionally, willfully and

unlawfully administered a lethal amount of caffeine to her daughter only for the purpose of causing illness. The defendant foreclosed this option by presenting evidence that the caffeine was due to Coke syrup containing caffeine administered to control nausea. Therefore, we find that no evidence was presented to support a verdict of involuntary manslaughter. Accordingly, the circuit court did not err in not instructing on that charge.

### E.

### *Prosecutorial Misconduct*

Finally, we must examine the assignment of error involving prosecutorial misconduct, as it relates to the conviction for the attempted poisoning of Seth.

The defendant presents several issues alleged to be misconduct by the State: (1) improper remarks during opening statement and closing argument, and (2) using perjured testimony and failing to reveal exculpatory evidence. We shall examine these issues separately.

### 1. *Improper remarks during opening statement and closing argument.*

 It is argued by the defendant that the prosecutor made improper remarks to the jury during the State's opening statement and closing argument.[32] The rule in this State has long been that "[i]f either the prosecutor or defense counsel believes the other has made improper remarks to the jury, a timely objection should be made coupled with a request to the court to instruct the jury to disregard the remarks." Syl. Pt. 5, in part, *State v. Grubbs*, 178 W.Va. 811, 364 S.E.2d 824 (1987). *See State v. Lewis*, 133 W.Va. 584, 57 S.E.2d 513 (1949); *State v. Files*, 125 W.Va. 243, 24 S.E.2d 233 (1942); and *State v. Fisher*, 123 W.Va. 745, 18 S.E.2d 649 (1941).

 A review of the record shows that defense counsel made no objections to any remarks by the prosecutor during the State's opening statement and closing argument. This Court has long held that "[f]ailure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court." Syllabus Point 6, *Yuncke v. Welker*, 128 W.Va. 299, 36 S.E.2d 410 (1945). *See also*, Syl. Pt. 1, *State v. Garrett*, 195 W.Va. 630, 466 S.E.2d 481 (1995). *See* Syl. Pt. 5, *Tennant v. Marion Health Care Foundation, Inc.*, 194 W.Va. 97, 459 S.E.2d 374 (1995); Syl. Pt. 1, *Daniel B. by Richard B. v. Ackerman*, 190 W.Va. 1, 435 S.E.2d 1 (1993); Syl. Pt. 5, *State v. Davis*, 180 W.Va. 357, 376 S.E.2d 563 (1988); and Syl. Pt. 7, *State v. Cirullo*, 142 W.Va. 56, 93 S.E.2d 526 (1956). In view of our precedent, the defendant cannot argue for the first time on appeal that the prosecutor made improper remarks during the State's opening statement and closing argument.[33]

### 2. *Using perjured testimony and failing to reveal exculpatory evidence.*

 The defendant has awkwardly attempted to argue that the State engaged in misconduct by failing to provide her with information regarding fees paid to its witnesses and that at least one witness presented perjured testimony on this issue. It is further contended by the defendant that such information constituted exculpatory evidence. In view of the record in this case we find no merit to this assignment of error.

This Court has ruled that "[a] prosecution that withholds evidence which if made available would tend to exculpate an accused by

---

**32.** This Court held in Syllabus Point 1 of *State v. Dunn*, 162 W.Va. 63, 246 S.E.2d 245 (1978) that "[a] judgment of conviction will not be reversed because of improper remarks made by a prosecuting attorney in his opening statement to a jury which do not clearly prejudice the accused or result in manifest injustice."

**33.** The defendant has invited this Court to invoke the plain error doctrine to this assignment of error. We have reviewed the remarks of the prosecutor and find that this issue does not warrant application of the plain error doctrine. "The plain error doctrine of W.Va.R.Crim.P. 52(b), whereby the court may take notice of plain errors or defects affecting substantial rights although they were not brought to the attention of the court, is to be used sparingly and only in those circumstances in which a miscarriage of justice would otherwise result." Syl. Pt. 4, *State v. Grubbs*, 178 W.Va. 811, 364 S.E.2d 824 (1987).

creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution."Syl. Pt. 4, *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982). We have also held that "[t]he prosecution must disclose any and all inducements given to its witnesses in exchange for their testimony at the defendant's trial." Syl. Pt. 2, *State v. James*, 186 W.Va. 173, 411 S.E.2d 692 (1991).

The State contends that it only paid one expert witness an actual fee and that was Dr. Scharman. All other expert witnesses used by the State were merely reimbursed for travel expenses and lodging expenses (including meals). During the State's opening argument it informed the jury that only one of its experts was being paid a fee for testifying. The defendant seeks to contend that payment of travel and lodging expenses constitutes fees for testimony. We are cited to no case law to support this suggestion, nor will we adopt such a position.

The defendant also contends that one of the State's witnesses lied regarding being paid a fee for testifying. The defendant asked Dr. Zitelli if he was paid a fee to testify and Dr. Zitelli said no. The defendant contends that this constituted perjury because Dr. Zitelli's out-of-pocket expenses were paid by the State. We reject this as perjured testimony. Payment of out-of-pocket expenses is simply not payment of a fee for testifying.

### III.

### CONCLUSION

Based on the foregoing, we find no errors in the trial below. Accordingly, the judgment of the Circuit Court of Greenbrier County is affirmed.

Affirmed.

STARCHER, Chief Justice, concurring.

(Filed Sept. 8, 1999)

I concur in the majority opinion, with the exception of part E.2.

The reason that I do not join in part E.2 of the majority opinion is that I disapprove of the prosecutor's conduct in providing travel and lodging for the prosecution's expert witnesses.

Specifically, the prosecutor obtained a private donation of luxurious lodging at the Greenbrier Hotel in White Sulphur Springs for prosecution witnesses. The prosecutor also allowed a private businessperson to pay for a chartered airplane for a prosecution expert.

I recognize that the financial burden on a prosecutor's office from a case that needs experts is high, and the impulse to "save public funds" is commendable.

But there are at least two fatally improper aspects of such a practice.

First, it looks like a shakedown. Who can say "no" to a request by a prosecutor for assistance without at least a lingering fear that there may be bad consequences from reprisal?

Second, a prosecutor becomes officially indebted to a private party that may come into conflict with the law. This creates an appearance of impropriety that undermines public confidence in the judicial system.

This sort of conduct is a slippery slope. It should not re-occur in any of our state's criminal prosecutions.