**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

State of West Virginia,
Plaintiff Below, Respondent

vs.)  No. 21-0112 (Hancock County 19-F-11)

Michael J.,
Defendant Below, Petitioner

## MEMORANDUM DECISION

Petitioner Michael J., by counsel P. Zachary Stewart, appeals the Circuit Court of Hancock County's January 8, 2021, order sentencing him to consecutive terms of incarceration of not less than ten nor more than twenty years for his two convictions for sexual abuse by a parent, guardian, custodian, or person in a position of trust to a child.[1] Respondent State of West Virginia, by counsel Patrick Morrisey and Lara K. Bissett, filed a response. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner was indicted in January of 2019 on one count of third-degree sexual assault, two counts of third-degree sexual abuse, and two counts of sexual abuse by a parent, guardian, custodian, or person in a position of trust to a child, of petitioner's stepdaughter, M.L.

Prior to petitioner's trial, which was held later in 2019, the two third-degree sexual abuse charges were dismissed; and at trial, following the close of the State's case-in-chief, petitioner successfully moved for judgment of acquittal on the third-degree sexual assault charge due to a

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *In re Jeffrey R.L.*, 190 W. Va. 24, 435 S.E.2d 162 (1993); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

lack of evidence of "sexual intrusion." But this trial ended in a mistrial because the circuit clerk provided the jury with the entire case file during its deliberations:

>THE COURT: All right. Very well. Bailiff if you would please retrieve their question for us, sir.
>
>(Bailiff complies.)
>
>(Bailiff handing question to the [c]ourt.)
>
>THE COURT: Thank you, sir.
>
>It appears as if the entire file went back to the jury.
>
>THE CLERK: Yeah. Were they not supposed to get the whole thing?
>
>THE COURT: No. They were supposed to get the verdict form and the seven exhibits.
>
>I'll read the question—
>
>THE CLERK: Well—
>
>THE COURT: I'll read the question: Is the information contained in the file provided to the jury able to be used in the jury's decision? Specifically, quote, "Defendant's motion in limine and memorandum of law in support thereof crimes, wrongs or other acts," end quote. Regarding: One, defendant's alleged history of porn addiction; two, unfounded allegations for the relinquishment of parental rights of prior child of the defendant; and, three, unfounded allegations of incident with a juvenile during the course of the defendant's prior employment.
>
>THE CLERK: Honest to God, Judge, I thought we took the whole thing back there.
>
>THE COURT: No. If that's definitely the practice, it should be not. They should only have the verdict form and the exhibits.
>
>THE CLERK: I know where this is headed.
>
>MR. STEWART [petitioner's counsel]: Judge.
>
>THE COURT: Mr. Stewart.
>
>MR. STEWART: Based on what has been learned and because of the question that has been posed by the jury, I am requesting that this trial be declared a mistrial.
>
>THE COURT: Ms. Stewart—or, excuse me, Ms. Cowden.

2

MS. COWDEN [the prosecuting attorney]:   I can't object to that.

THE CLERK:        My apologies to both of you, because I swear to God, I thought that that was what we did. Obviously I won't make that mistake again.

THE COURT:        All right. The defense's motion for a mistrial will be granted and without objection.

Bailiff, if you would please bring the jury back in.

The Bailiff brought the jurors back to the courtroom where the court told them that it had granted a mistrial, explained why it had granted the mistrial, and apologized for the error. The circuit clerk interjected, "No. I'm the one who needs to apologize. I did it. It was a mistake. I apologize to each of you." The jury was then excused, and the court granted petitioner's motion to continue the matter to the next term of court.

In March of 2020, petitioner moved to dismiss the indictment on double jeopardy grounds. He argued that he was "entitled to the constitutional protect[ion] against double jeopardy" because the clerk's conduct was "governmental conduct . . . intended to goad the defendant into moving for a mistrial." Finding that petitioner's motion for a mistrial "was not intentionally provoked by prosecutorial or judicial conduct," the court denied the motion to dismiss the indictment.

The parties appeared for trial in August of 2020 on the two remaining counts in the indictment, which both charged sexual abuse by a parent, guardian, custodian or person in a position of trust to a child. During this time, certain COVID-19 mitigation practices, including the installation of plexiglass barriers around the witness stand and the spacing of jurors around the courtroom, were employed by the court. After the jury was selected, the court informed the jurors that

> because we do have this [p]lexiglass bubble put in place so that our witnesses can testify, since they may be speaking for extended lengths of time, with their mask down, so as to help both you and the attorneys gauge their veracity and their testimony, you can feel free to try and angle about as necessary so that you can keep a good eye on the witnesses.[2]

---

[2] On the second day of trial, outside the presence of the jury, petitioner moved for a mistrial on the grounds that jurors' views were allegedly obstructed. Petitioner claimed that certain jurors were "seated in locations in which the metal corner of the [p]lexiglass nearest, for the witness box—for the witness that is nearest to the traditional jury box is in such a location that it impedes their view to see a testifying witness." Petitioner also noted that the court reporter's location may be obstructing views, but he could not "quite tell whether the witness is up high enough above the court reporter from the floor to determine whether any of those jurors are partially obstructed from that view as well."

(continued . . .)

The State called four witnesses. First, Patrolman Sam Krzys, an officer with the Weirton Police Department who was employed as the Prevention Resource Officer at Weir High School, testified that on October 12, 2018, he was informed of a possible sexual assault case involving M.L., who was then a senior at Weir High School. Patrolman Krzys called Detective Gerard Spencer, another employee of the Weirton Police Department, "because, usually, if there's something like that, that's a pretty big situation." The two officers then met with M.L. Patrolman Krzys testified that M.L. "was very shook up" and "didn't really want to speak too much about it" but disclosed that petitioner "had sexually assaulted her and touched her approximately seven years ago." M.L. offered no details at that point, and the investigation was taken over by Detective Spencer.

Next, Detective Spencer testified that M.L. disclosed that when she was approximately eleven years old and in the sixth grade, petitioner "put his hands in her vagina—his fingers." While recalling the event, M.L. "was upset and crying. You could barely understand her because she was very emotional." Detective Spencer further testified that, in his experience, it is not unusual for victims to delay reporting assaults: "Juveniles are usually scared to do it and they will wait until later on or something like that." Detective Spencer testified that the officers arranged for M.L. to undergo a forensic interview at the Comfort House. Danielle Sharot conducted the interview, and Detective Spencer and Tamara Jones, employed by Child Protective Services, observed the interview.

The State's third witness, M.L., testified that in October of 2018, an individual spoke to students at her high school regarding his work with serial killers and other criminals, "[a]nd he touched the topic of sexual assault and was saying that there are many people affected by it every year, and it was just, I don't know, something triggered me." After school, M.L. disclosed the abuse to several of her friends. The following day at school, her classmates were discussing the prior day's presentation, including the references to sexual assault, and M.L. "just started crying and tearing up." M.L.'s teacher took M.L. from the classroom, and M.L. disclosed the abuse to her teacher. The principal was then notified, and the meeting testified to by Patrolman Krzys and Detective Spencer took place.

---

The court denied petitioner's motion, finding that it had

> deal[t] with [the issue] . . . by instruct[ing] all these jurors that, because of the posts that have to be in place to support the [p]lexiglass barriers, which were recommended by the Supreme Court, that they could shift in their seats and do whatever they needed to do to adjust themselves so that they could more fully see the faces of the witnesses as they were giving testimony.

The court also noted that one juror had contacted the bailiff about moving closer to better hear the testimony.

M.L. testified to two instances of abuse, the first of which occurred when she was eleven years old. She testified that she was lying down watching a movie in her mother and petitioner's bed with her mother, petitioner, and her little brother, as was typical for their family, when petitioner "touch[ed] the inner side of [her] thigh." M.L. testified that her mother was asleep— M.L. "could hear her snoring"—as was her little brother. After rubbing her thigh for approximately a minute, M.L. testified that petitioner "put his hands up my pants, like under my underwear. . . . I know he went under my underwear and started rubbing my vagina" with his fingers. M.L. recounted that she became "so scared, [she] just jumped out of the bed and . . . ran to [her] room." The day after this incident occurred, M.L. testified that petitioner stopped her on her way to the kitchen and said, "you wouldn't want to tell anybody about this. You don't want to tell anybody, it would ruin everything."

The second instance about which M.L. testified took place "[n]ot that long after the first one happened." M.L., her mother, and her little brother were watching TV when petitioner began to complain that his back was hurting. M.L. explained that she "used to like give everyone massages," and M.L.'s mother told M.L. to give petitioner a massage. "So I went over and did it, and I was laying by him and he pushed me on top of his body and just starts like dragging my body up and down against his body." M.L. further testified that she "could feel his penis like erected, like rubbing against me."

M.L. did not disclose the abuse earlier because she worried about her little brother, who has special needs, "being able to get the things that he needed for his disabilities." M.L. also worried for her mother because she "went through so much heartbreak and stuff. I was sad to see her go through so much."

On cross-examination, M.L. maintained that, during the second instance of abuse, petitioner did not get up from the couch until after the abuse. M.L. was confronted, however, with testimony she gave during the first trial that, after massaging petitioner's back, he got up from the couch to get a drink from the kitchen; then, after returning to the couch, M.L. testified "[t]hat's when he put me on top of him." When asked if she could "see how those answers that you gave may conflict with each other," M.L. explained that she "got mixed up" but that she is "not a liar."

The State's final witness, Tamara Jones, an intake worker with Child Protective Services, testified that she received a referral involving sexual allegations and met M.L. at the Comfort House for her forensic interview. Following M.L.'s interview, Ms. Jones went to petitioner's home to ask that he leave the home so that the children could remain there with their mother. Petitioner agreed to leave. Ms. Jones testified that as petitioner was gathering his belongings, "[h]e made comments about that the incident was a one-time occurrence and that it was a lapse of judgment on his part." Petitioner also reportedly "said that [M.L.] had understood and made the decision not to talk about it because it would cause him to lose his job, it would possibly make him go to prison and/or break their family up and have the children removed from their parents."

Following Ms. Jones's testimony, the State rested. Petitioner moved for judgment of acquittal, which the court denied.

In petitioner's case-in-chief, petitioner first called his father, who testified that petitioner has a history of sleepwalking. Petitioner's father described several instances of petitioner sleepwalking that occurred when petitioner was a young boy and another when petitioner was approximately twenty-five years old. Petitioner's father testified that when he asked petitioner about the incidents the mornings after they occurred, petitioner had no recollection of sleepwalking. On cross-examination, petitioner's father confirmed that petitioner had never "put his fingers in the panties of any young women" during any of the sleepwalking incidents of which he was aware.

Petitioner's wife and M.L.'s mother, R.J., testified next. In conflict with M.L.'s testimony, R.J. claimed that M.L. disclosed the abuse to her during a shopping trip when M.L. was sixteen or seventeen. R.J. testified that she spoke with petitioner, who acknowledged touching M.L.'s genital area but claimed "that it was an accidental tickling, that the touch had happened through that." R.J. also testified that petitioner sleepwalks, though petitioner did not claim to be sleepwalking when he admitted to touching M.L.'s genital area while tickling her. R.J. further described that petitioner "cuddle[s] up next to [her]" when they sleep, and

> [t]here would be times that I would wake up and he would be holding my hand or that his hand would be on my bottom or on my thigh or, you know, his arm would be like over on my shoulder and, you know, his hand would be touching my breast or something.

To the best of R.J.'s knowledge, petitioner was not awake when this touching occurred.

R.J. further testified that M.L. disclosed only the first instance of petitioner's abuse to her; M.L. did not recount the instance that took place on the couch, despite R.J. asking M.L. to "please tell [her]" if anything else had happened. R.J. also testified that she could not "remember a time of [petitioner] really ever sitting on" the couch on which M.L. claimed petitioner abused her. R.J. also denied that it was typical for M.L. to give massages, and she denied that it ever appeared as though M.L. was avoiding petitioner. R.J. said that M.L. continued to bring friends over to the house and on vacations that included petitioner.

R.J. also testified that M.L. has "sleep issues of her own." In particular, M.L. "would get up in the middle of the night and get dressed for school or she would come down and just sit on the steps and just sit there." R.J. claimed further that M.L. has a history of lying to her, particularly about where M.L. had been. For instance, R.J. said that M.L. "would tell me that she was at one friend's house and be somewhere in a completely different location."

R.J. testified that petitioner could not get an erection easily or quickly due to the medications he was on and that it would usually take ten minutes and a penis ring for him to get an erection.

Finally, R.J. stated that she was present when Ms. Jones asked petitioner to leave the home, and R.J. denied that petitioner ever used the phrase "lapse of judgment" or stated that "it was a one-time incident."

6

Petitioner testified that, regarding the abuse that M.L. described as occurring on the bed, he asked M.L. to move over so that he could get in the bed. He testified that M.L. "was being obstinate and so I tickled her. I was like, move over, and she was like, okay, and then moved over in bed." Petitioner did not recall any inappropriate touching that night, but he said that the following morning M.L. informed him that he had touched her in the middle of the night. He denied telling M.L. not to discuss this with her mother or that it could ruin the family. He then categorically denied the second incident that M.L. claimed occurred on the couch.

Petitioner testified that, after M.L. reportedly disclosed the abuse to her mother, petitioner told M.L. "that I was very sorry, I didn't remember the incident, that it was an accident. I told her that I tickled her to move her over in bed. I fell asleep. I did not know anything until the next morning when she approached me." Petitioner clarified that he tickled M.L. to move her over in the bed and that he fell asleep "[a]s soon as [his] head hit[] the pillow." Then, in terms of touching M.L.'s genitals, he acknowledged that it could have happened but, if it did, he was sleepwalking.

Petitioner also testified that M.L. "started to smoke marijuana very frequently [when she turned seventeen], and we actually told her we were going to turn her in to the police if she didn't stop. This was about two months before she turned me in." M.L. reportedly responded that she would tell her father, her mother, and the police what petitioner had done, and petitioner "would say, go ahead, [M.L.]. You're still not going to be able to go with your boyfriend and sleep at . . . his house, you're still not going to go with this person because they're doing marijuana."

Like his wife, petitioner denied telling Ms. Jones that he had a lapse in judgment or that there was any one-time occurrence. Petitioner also described his issues getting and maintaining an erection.

Following petitioner's testimony, the defense rested. The State offered a brief rebuttal. During the State's closing argument, the prosecutor began by stating that "[t]here is no script as to how we, as human beings, are going to react to traumatic events in our lives." The prosecutor then explained that her grandmother passed away in 2011 and that, prior to her death, her grandmother would bring Reese's peanut butter eggs to the prosecutor's house for several weeks during the time those seasonal candies were available. Immediately following her grandmother's death, the prosecutor recounted that she "didn't shed a tear." "And the funeral came and went, and I didn't cry again, not a tear. I gave the eulogy, didn't cry, nothing." But several months later, when the Reese's peanut butter eggs were again available in stores, "[t]he tears welled up in my eyes and I cried for the first time." The prosecutor then asked the jury to "take that scenario and apply it to this case" to understand that "[t]here is no script for" an appropriate way to act following sexual abuse. "We do not know how that child is going to react. We don't know what she's been through. We don't know what her life is like. There is no script for it." The majority of the State's closing argument was devoted to recounting the evidence presented at trial and arguing how that evidence fit the elements of the crime petitioner was alleged to have committed, but the prosecutor concluded,

> This brings us full circle. Ask yourselves why did [M.L.] come forward. She was sitting in that assembly while they're talking about sexual abuse saying, look

7

around you, there's people in this room that you don't even know this happened to. And every wall that she had built up to defend herself all these years came crumbling down at that time. This . . . assembly was my peanut butter Easter eggs. You never know how a person is going to react when faced with trauma.

In petitioner's closing argument, he highlighted certain inconsistencies in the evidence, and he argued that M.L. was

clearly emotional, she really believes that something may have happened. But there are times when beliefs are so deep and so vivid that it may become real to her. But what is her belief and real to her may not match up with reality, and that's really unfortunate if that is where this case lands.

In the State's rebuttal, the prosecutor returned to speaking of her grandmother's death. She said that there were many details she could not recall, such as who paid their respects at her grandmother's funeral or what the flowers looked like, but that she "vividly" remembered bringing her grandmother an afghan to comfort her in the hospital prior to her death and the two mugs gifted to her by the owner of the funeral home at which her grandmother's funeral services were held. Relating the story back to the case at hand, the prosecutor continued,

And the point of this is, what I initially was trying to get across in the beginning of my closing argument, not only do we not know how we're going to react to trauma, but we're not going to remember everything. We're not going [to] remember everything in detail.

And the reasonable doubt that [petitioner's counsel] is arguing to you are miniscule details, whether some encounter was upstairs or downstairs, the order that they were lying in bed, miniscule—oh, the TV, who remembers when they purchased the TV. . . .

If an 11[-]year[-]old has her stepfather touching her vagina, she's not going to necessarily have crystal clear details of what happened. I don't have crystal clear details and memory as a—I don't even want to tell you—2011, a late 30[-]year[-]old woman when my grandmother passed away, I don't have clear details of that event. Yet the defense is expecting [M.L.] to have crystal clear details of when this event occurred.

Following the jury's verdict of guilty of both charges, petitioner moved for a new trial. He argued that the strips of metal joining the plexiglass sheets installed around the witness stand as a protective measure against COVID-19 impeded jurors' views and, therefore, their ability to judge witness credibility. Petitioner also argued that the positioning of the court reporter in front of the witness stand may have obstructed the jurors' views.

In denying petitioner's motion for a new trial, the court noted that, due to the COVID-19 pandemic, the court "took measures it deemed necessary to protect the safety of all individuals present in the courtroom during trial," including the construction of a plexiglass barrier around the witness stand and the seating of jurors on the floor of the courtroom to ensure a safe distance

between those in the courtroom. The court found that, contrary to the position taken by petitioner,

> the plexiglass barrier allowed the witness to testify without facemasks; and thus, the jurors were able to see their facial expressions and body language. Further, none of the jurors seated on the floor of the courtroom complained of not being able to view the witness stand over the court reporter. Finally, the [c]ourt instructed the jurors that each of them could shift in their seats or move as needed to have a clear view of each witness while testifying.

The court sentenced petitioner to consecutive terms of incarceration of not less than ten nor more than twenty years for each conviction of sexual abuse by a parent, guardian, custodian, or person in a position of trust to a child. Petitioner's sentence was memorialized in the court's January 8, 2021, order, and it is from this order that petitioner appeals.

Petitioner raises three assignments of error on appeal. In his first, he argues that the court erred in denying his motion to dismiss the indictment. He argues that the circuit clerk's conduct in taking the entire case file to the jury room during his first trial amounted to "governmental conduct . . . intended to goad the defendant into moving for a mistrial." *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982). Petitioner submits that, by providing the entire file, the clerk disobeyed the court's directive to provide the jury with only the exhibits and verdict form, and the clerk's conduct amounts to "official misconduct," "neglect of duty," and/or "incompetence" under West Virginia Code § 6-6-1. Petitioner also asserts that because the Hancock County Prosecutor's Office has failed to initiate removal proceedings against the clerk that it has the power to initiate, it has "impliedly approved" of the clerk's conduct at petitioner's first trial. For these reasons, petitioner asserts that a subsequent trial should have been barred under *Kennedy* and double jeopardy principles.

"This Court's standard of review concerning a motion to dismiss an indictment is, generally, *de novo*." Syl. Pt. 1, in part, *State v. Grimes*, 226 W. Va. 411, 701 S.E.2d 449 (2009). Relying on *Kennedy*, this Court has held that "[w]hen a mistrial is granted on motion of the defendant, unless the defendant was provoked into moving for the mistrial because of prosecutorial or judicial conduct, a retrial may not be barred on the basis of jeopardy principles." Syl. Pt. 8, *State v. Pennington*, 179 W. Va. 139, 356 S.E.2d 803 (1987) (citation omitted). And, in determining whether the clerk intended to provoke petitioner's motion for a mistrial, we have held that "[t]he determination of 'intention' in the test for the application of double jeopardy when a defendant successfully moves for a mistrial is a question of fact, and the trial court's finding on this factual issue will not be set aside unless it is clearly wrong." Syl. Pt. 2, *State ex rel. Bass v. Abbot*, 180 W. Va. 119, 375 S.E.2d 590 (1988).

We find no error in the trial court's denial of petitioner's motion to dismiss the indictment. From the record set forth above, it is clear that the clerk did not intentionally provoke petitioner into moving for a mistrial. The clerk misunderstood which items were to go to the jury, and he apologized repeatedly for his mistake. In *Bass*, we characterized the offending conduct as "terribly negligent" but nevertheless found that "such negligence does not equal intent." *Id.* at 121, 375 S.E.2d at 592. Here, too, while the clerk may have been terribly negligent in providing

9

the jurors in petitioner's first trial with the entire case file, we find that the trial court's conclusion that the clerk did not intend to provoke a mistrial was not clearly wrong.

In petitioner's second assignment of error, he argues that the prosecutor erred in analogizing her experience in recalling the details of her grandmother's passing to M.L.'s inability to recall details of the sexual abuse perpetrated by petitioner. Petitioner notes that no evidence was developed concerning why M.L. could not accurately recall all details, nor did any expert witness testify about trauma or the effects of trauma on memory. Petitioner submits that the prosecutor's argument "created new and misleading evidence" and amounted to an "impermissible attempt to qualify herself as an expert witness on trauma and traumatic events." Petitioner did not object to the prosecutor's remarks, however, so he urges this Court to find plain error.

> The rule in this State has long been that "[i]f either the prosecutor or defense counsel believes the other has made improper remarks to the jury, a timely objection should be made coupled with a request to the court to instruct the jury to disregard the remarks." Syl. Pt. 5, in part, *State v. Grubbs*, 178 W.Va. 811, 364 S.E.2d 824 (1987). *See State v. Lewis*, 133 W.Va. 584, 57 S.E.2d 513 (1949); *State v. Files*, 125 W.Va. 243, 24 S.E.2d 233 (1942); and *State v. Fisher*, 123 W.Va. 745, 18 S.E.2d 649 (1941).

*State v. Davis*, 205 W. Va. 569, 586, 519 S.E.2d 852, 869 (1999). Also,

> [t]his Court has long held that "[f]ailure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court." Syllabus Point 6, *Yuncke v. Welker*, 128 W.Va. 299, 36 S.E.2d 410 (1945). *See also*, Syl. Pt. 1, *State v. Garrett*, 195 W.Va. 630, 466 S.E.2d 481 (1995). *See* Syl. Pt. 5, *Tennant v. Marion Health Care Foundation, Inc.*, 194 W.Va. 97, 459 S.E.2d 374 (1995); Syl. Pt. 1, *Daniel B. by Richard B. v. Ackerman*, 190 W.Va. 1, 435 S.E.2d 1 (1993); Syl. Pt. 5, *State v. Davis*, 180 W.Va. 357, 376 S.E.2d 563 (1998); and Syl. Pt. 7, *State v. Cirullo*, 142 W.Va. 56, 93 S.E.2d 526 (1956).

*Davis*, 205 W. Va. at 586, 519 S.E.2d at 869. Petitioner urges us to apply the doctrine of plain error, but he faces an uphill climb as "the doctrine of plain error with regard to objectionable closing remarks is sparingly applied." *State v. Grubbs*, 178 W. Va. 811, 818, 364 S.E.2d 824, 832 (1987). Rather, counsel is required to make timely objections "so that the matter can be corrected at the trial court level. There is obviously a considerable tactical advantage to be gained if counsel can remain silent and then press the point on appeal through the plain error doctrine." *Id.* Further, "[b]y its very nature, the plain error doctrine is reserved for only the most flagrant errors," *State ex rel. Games-Neely v. Yoder*, 237 W. Va. 301, 310, 787 S.E.2d 572, 581 (2016), and to trigger application of the doctrine, "there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, in part, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). We have explained that "[t]o affect substantial rights means the error was prejudicial. It must have affected the outcome of the proceedings in the circuit court, and the defendant rather

than the prosecutor bears the burden of persuasion with respect to prejudice." *Id.* at 7, 459 S.E.2d at 118, Syl. Pt. 9, in part.

In light of the high bar petitioner must clear, even if we were to assume that the prosecutor's remarks were improper, reversal is not warranted here because any error was not prejudicial, nor would manifest injustice result. This Court will not reverse a conviction due to a prosecutor's improper remarks unless the remarks "clearly prejudice the accused or result in manifest injustice." Syl. Pt. 5, in part, *State v. Ocheltree*, 170 W. Va. 68, 289 S.E.2d 742 (1982).

> Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Syl. Pt. 6, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995). Despite petitioner's protestations otherwise, the prosecutor made no attempt to qualify herself as an expert; thus, we reject that characterization of the State's closing arguments out of hand. The remarks concerning the prosecutor's grandmother's death did not mislead the jury, nor do we find, in view of the entirety of the State's closing arguments, that they were extensive or deliberately placed before the jury to divert its attention. Rather, the majority of the State's closing was devoted to recounting the evidence and arguing how that evidence aligned with each element of the crime of sexual abuse by a parent, guardian, custodian, or person in a position of trust to a child that the State bore the burden of proving. Importantly, that evidence constituted strong competent proof of petitioner's guilt. As noted above, M.L. testified to petitioner's abuse, and Tamara Jones, the Child Protective Services intake worker, testified that petitioner basically admitted to at least one event. Petitioner's own witnesses did little to support his defense. His wife R.J. testified that petitioner acknowledged an inappropriate touch he claimed occurred during "accidental tickling," and petitioner, too, acknowledged that he could have inappropriately touched M.L. but insisted that, if he did so, he would have been "sleepwalking." Even without the prosecutor's remarks during closing, the evidence supports the jury's verdicts. Accordingly, we find that the remarks did not clearly prejudice petitioner or result in manifest injustice.

In petitioner's third and final assignment of error, he claims that, during his trial, four jurors were seated in locations where their views were obstructed by the metal frames joining plexiglass panels around the witness stand and that six jurors may have had their views obstructed by the court reporter, who was seated in front of the witness stand. Petitioner argues that the court's instruction to the jurors to move around as necessary was insufficient because a juror with an obstructed view was required to "put in extra effort compared to those . . . with unobstructed views." He assumes this "means that some amount of concentration . . . is naturally lost," and he further assumes that jurors, who are "unfamiliar and uncomfortable in the courtroom," may not "act independently and move on their own." Petitioner states that "justice could not have been achieved at his trial," and as a result, the court erred in denying his motion for a new trial.

11

"A trial judge's decision to award a new trial is not subject to appellate review unless the trial judge abuses his or her discretion." Syl. Pt. 2, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000) (citations omitted).

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

*Id.* at 641, 535 S.E.2d at 485, Syl. Pt. 3.

The court did not abuse its discretion in denying petitioner's motion for a new trial. His claim that the jurors' views were obstructed is purely speculative. Although petitioner provides pictures of the witness stand and its plexiglass panels, the pictures in no way establish that the narrow frames to which the panels were affixed impeded any juror's view of the witnesses, and no jurors complained of an obstructed view. Moreover, petitioner's speculation that the jurors likely lacked the self-assuredness to move is at odds with the record at trial, which shows that a juror requested to move closer to better hear the proceedings. Accordingly, petitioner has failed to demonstrate error in the court's conclusions regarding his motion for a new trial as

> [a]n appellant must carry the burden of showing error in the judgment of which he complains. This Court will not reverse the judgment of a trial court unless error affirmatively appears from the record. Error will not be presumed, all presumptions being in favor of the correctness of the judgment.

Syl. Pt. 3, *State v. Gray*, 217 W. Va. 591, 619 S.E.2d 104 (2005) (citations omitted). Also, "[a] party can not establish facts in a case by asserting them in a brief. Those are nothing more than an attorney's statements, which are not evidence." *State v. Benny W.*, 242 W. Va. 618, 629, 837 S.E.2d 679, 690 (2019) (citations omitted). Accordingly, we find that petitioner's speculative statements, which are not evidence, fail to establish error in the court's denial of his motion for a new trial.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** February 25, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice Alan D. Moats sitting by temporary assignment

12